**GTE SOUTH INCORPORATED,**
Plaintiff,

v.

**Theodore V. MORRISON, Jr., Hullihen Williams Moore; and I. Clinton Miller; (In Their Official Capacities as Commissioners of the Virginia State Corporate Commission)**

and

**Cox Fibernet Commercial Services, Inc.,**

and

**MCI Telecommunications Corporation; and MCIMetro Access Transmission Services Inc.,**

and

**AT & T Communications of Virginia, Inc., Defendants.**

**Civil Action No. 3:97CV493.**

United States District Court,
E.D. Virginia,
Richmond Division.

May 19, 1998.

---

Richard David Gary, Richard B. Harper, Hunton & Williams, Richmond, VA, Lewis Franklin Powell, III, Hunton & Williams, Richmond, VA, Edward Joseph Fuhr, Hunton & Williams, Richmond, VA, Robert Reynold Merhige, IV, Hunton & Williams, Richmond, VA, Paul T. Cappuccio, Kirkland & Ellis, Washington, DC, John A. Rogovin, O'Melveny & Myers, L.L.P., Washington, DC, William P. Barr, Washington, DC, Paul Mirengoff, Hunton & Williams, Richmond, VA, for GTE South Incorporated.

Theodore C. Hirt, U.S. Department of Justice, Federal Programs Branch, Civil Division, Washington, DC, Jonathan T. Foot, U.S. Department of Justice, Washington, DC, Robert William Jaspen, U.S. Attorney's Office, Richmond, VA, for United States of America.

Robert McMurdo Gillespie, State Corporation Commission, Office of General Counsel, Richmond, VA, James Constantine Dimitri, Charles Meade Browder, Jr., State Corporation Commission, Office of General Counsel, Richmond, VA, John Adrian Gibney, Jr., Robert A. Dybing, Shuford, Rubin & Gibney, P.C., Richmond, VA, for Theodore V. Morrison, Jr., Hullihen Williams Moore, I. Clinton Miller.

John Daniel Sharer, Michael W. Smith, Christian, Barton, Epps, Brent & Chappell, Richmond, VA, Edwin Ford Stephens, Christian & Barton, L.L.P., Richmond, VA, for Cox Fibernet Commercial Services, Inc.

George A. Somerville, James Crawford Roberts, Dabney Jefferson Carr, IV, Mays & Valentine, Richmond, VA, Wilma R. McCarey, AT & T Communications of Virginia, Inc., Oakton, VA, for AT&T Communications of Virginia, Inc.

Elizabeth Powell Mason, Robert Edward Eicher, Howard W. Dobbins, Robert Dean Perrow, Williams, Mullen, Christian & Dobbins, Richmond, VA, Jodie L. Kelley, Jenner & Block, Washington, DC, Donald B. Verrilli, Jr., Jenner & Block, Washington, DC, Thomas F. O'Neill, III, William Single, IV, Matthew B. Pachman, MCI Telecommunications, Washington, DC, for MCI Telecommunications Corporation, MCIMetro Access Transmission Services of Virginia, Inc.

Claude Alexander Allen, Gregory E. Lucyk, Alice Ann Berkebile, Office of the Attorney General, Richmond, VA, for Attorney General of Virginia.

Theodore C. Hirt, U.S. Department of Justice, Federal Programs Branch, Civil Division, Washington, DC, Jonathan T. Foot, U.S. Department of Justice, Washington, DC, Robert William Jaspen, U.S. Attorney's Office, Richmond, VA, for Federal Communications Commission.

## FINAL ORDER

SPENCER, District Judge.

THIS MATTER comes before the Court on cross motions for summary judgment pursuant to Rule 56 of the *Federal Rules of Civil Procedure*. Each party to this action has moved for summary judgment on its behalf. For the reasons stated in the accompanying Memorandum Opinion, the Court GRANTS summary judgment for Theodore V. Morrison, Jr.; Hullihen Williams Moore; and I. Clinton Miller who have been sued in their official capacity as Commissioners of the Virginia State Corporation Commission ("SCC"). The Court FINDS that the MECPR pricing methodology violates the Telecommunications Act of 1996, P.L. 104–104, 110 Stat. 56 (1996). The COURT further FINDS that 47 U.S.C. § 251(d)(1) is best read to exclude historical costs. GTE's taking claim is not ripe for adjudication and is hereby DISMISSED WITHOUT PREJUDICE. Similarly, the Court DISMISSES Count II(A) of the Complaint WITHOUT PREJUDICE. The Court DIRECTS implementation of the Interconnection Agreement as approved by the SCC.

Let the Clerk send a copy of this Order to all counsel of record.

And it is SO ORDERED.

## MEMORANDUM OPINION

THIS MATTER comes before the Court on cross motions for summary judgment pursuant to Rule 56 of the *Federal Rules of Civil Procedure*. Each party to this action has moved for summary judgment on its behalf. For the reasons stated below, the Court GRANTS summary judgment for Theodore V. Morrison, Jr.; Hullihen Williams Moore; and I. Clinton Miller who have been sued in their official capacity as Commissioners of the Virginia State Corpo-

ration Commission ("SCC"). The Court DIRECTS implementation of the Interconnection Agreement as approved by the SCC.

### INTRODUCTION

The Telecommunications Act of 1996 is "an Act to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, preamble, PL 104–104, 110 Stat. 56 (1996). Congress endeavored to deconstruct the previous regulatory regime which granted seven Regional Bell Operating Companies ("RBOCs") a local monopoly protected by the Modification of Final Judgement settlement.[1] To achieve this end, Congress developed a framework to promote competition in the local telephone markets and implemented it through the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996) ("the 1996 Act").

The 1996 Act prescribes three interrelated methods a new entrant may use to compete in the local market. First, a new entrant may interconnect its own facilities and equipment with the local exchange carrier's network. *See* 47 U.S.C. § 251(c)(2). Next, the new entrant may pay the local exchange carrier for unbundled network elements which include the facility or equipment used to provide telecommunications service. *See* 47 U.S.C. § 251(c)(3); 47 U.S.C. § 153(29). As a third alternative, a new entrant may purchase at wholesale rates from the local carrier "any telecommunications service the local carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4).

To facilitate this process, the 1996 Act provides procedures for negotiation, arbitra-

---

1. *See United States v. AT&T*, 552 F.Supp. 131 (D.D.C.1982), *aff'd*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). Prior to 1974, AT & T dominated both the local and long-distance markets. The Department of Justice brought an antitrust suit against AT & T which resulted in the Modification of Final Judgment ("MFJ") settlement. *See id.* The MFJ settlement required AT & T to withdraw or divest from the local phone market but allowed AT & T to continue its

long distance services and telephone equipment manufacturing plants. *See* H.R.Rep. No. 104–204, at 48–49 (1996). AT & T's withdrawal from the local market led to the creation of the RBOCs. The Telecommunications Act of 1996 combines the RBOCs with other local telephone providers such as GTE and refers to them collectively as incumbent local exchange carriers ("ILECs").

tion and approval of agreements between the local exchange carrier and the new entrant. *See, generally,* 47 U.S.C. § 252. An agreement, commonly referred to as the interconnection agreement, may be reached through voluntary negotiations, mediation or compulsory arbitration. Once the parties reach an interconnection agreement, the state commission shall approve or reject the agreement. *See* 47 U.S.C. § 252(e). Should the state commission decline to consider the agreement or fail to render a disposition within ninety days after its submission, the Federal Communications Commission ("FCC") may approve or reject the agreement. *See* 47 U.S.C. § 252(e)(4)–(5). When the state commission has made a determination under § 252, any party aggrieved by that determination may bring an action in Federal district court. 47 U.S.C. § 252(e)(6).

## FACTUAL BACKGROUND

Cox Fibernet Service, Inc. ("Cox"), pursuant to § 252(a) of the Act, initiated negotiations with GTE for interconnection of telecommunications networks and the purchase of unbundled network elements ("UNEs").[2] These negotiations proved unsuccessful in many respects; therefore Cox petitioned the SCC to arbitrate the unresolved issues with GTE. *See* 47 U.S.C. § 252(b). The SCC docketed the matter and consolidated this arbitration with relevant aspects of three additional failed negotiations involving GTE. These additional negotiations included arbitration of unresolved issues with AT & T of Virginia ("AT & T"), MCI Telecommunications Corporation ("MCI") and Sprint Communications Company L.P. ("Sprint").[3] GTE and Cox eventually reached an agreement approved by the SCC; however, GTE maintains that this agreement sets prices for access to its UNEs and customer services at a rate considerably lower than its actual costs. Consequently, GTE brings this action pursuant to section 252(e)(6) of the 1996 Act to challenge final arbitration determinations made by the SCC.

The SCC reached these final determinations after an organized and deliberate process. The SCC conducted hearings in two phases, a pricing phase and a non-pricing phase. Each phase proceeded as a panel consisting of a designated witness or witnesses for each party and the SCC Staff. Expert witnesses gave opening statements which were followed by witnesses posing questions and receiving responses from other panel members. Once this period of cross examination concluded, each party and the SCC Staff made closing remarks. Throughout this process, the SCC Commissioners freely interjected questions.

The first phase focused on pricing issues and elicited comments on policy, economics, cost and pricing from sixteen witnesses. The SCC proceedings began on November 19, 1996 and continued for six days. The second phase centered on non-pricing issues such as combining network elements, services required to make available at resale and GTE's duty to provide collocation. This hearing began on December 2, 1996 and continued for four days. Combined, the administrative record of these proceedings include thousands of pages of transcripts, exhibits, prepared testimony and cost studies.

Subsequent to these proceedings, the SCC issued its orders resolving the matters in dispute. On December 11, 1996, the SCC issued its Order Resolving Rates for Unbundled Network Elements and Interconnection, Wholesale Discount for Services Available for Retail and Other Matters, PUC 9600117; PUC960118; PUC 960124 and PUC 960131 ("Consolidated Order"). Later, on December 16, 1996, the SCC issued its Order Resolving Non–Pricing Issues and Requiring Filing of Interconnection Agreement, PUC 960118 ("Cox Order"). The SCC found, in part, that GTE based its proposed wholesale discount on nationwide data as opposed to Virginia specific data. Rec., p. 29443 (Consolidated Order, p. 3); Rec., pp. 1202–03 (Staff Report—Wholesale, pp. 4–5). The Record further indicated that GTE's cost

---

**2.** COX is a facility-based competitor which means that Cox has installed its own switches, fiber-optic cables and other telephone network equipment.

**3.** Sprint is not a party to this action.

study for network elements and interconnection lacked supporting data for modeling assumptions. *Id.,* p. 1151. GTE's cost study also contained "user-defined inputs" which did not permit independent testing. *Id.,* pp. 1151–58. Once considered in the context of the criticism of the alternative models, the SCC declined to set permanent prices on incomplete data. Instead, the SCC set interim prices pending receipt of additional information. Rec. pp. 29444–45 and pp. 29450–51.

After the arbitration, GTE and Cox signed an interconnection agreement (the "Agreement") documenting the prices and other terms resolved through arbitration and negotiation. By Order entered May 30, 1997, the SCC approved the Agreement. GTE challenges certain provisions of this Agreement as violative of the sections 251 and 252 of the 1996 Act and applicable FCC regulations. *See* 47 U.S.C. §§ 252(e)(6) and (e)(2)(b) (interconnection agreements must comply with FCC regulations).

### JURISDICTION AND VENUE

The Court has Jurisdiction over this matter pursuant to 47 U.S.C. § 252(e)(6) and 28 U.S.C. §§ 1331 and 1337.

Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c). A significant portion of GTE's property is located in the Eastern District of Virginia. Defendants Morrison, Moore and Miller reside in the Eastern District of Virginia. Cox's registered agent is located in Richmond, Virginia. Finally, a substantial part of the events and omissions giving rise to this action occurred in Richmond, Virginia. Venue is proper in this division pursuant to Rule 3 of the Local Rules for the United States District Court, Eastern District of Virginia.

### STANDARD OF REVIEW

Summary judgment is proper if, viewed in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Ross v. Communications Sat-*

*ellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). The essence of the inquiry that the court must make is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

### SCOPE OF REVIEW

Since 47 U.S.C. § 252(e)(6) does not set forth the standard, procedure or scope of judicial review, this Court shall look to controlling precedent to determine the scope of review. In *United States v. Carlo Bianchi and Co.,* 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), the Supreme Court held that the a federal statutory provision calling for federal judicial review which fails to indicate the standards to be used or procedures to be followed limits federal judicial review to the administrative record and prohibits *de novo* proceedings. *See also, Smith v. Chater,* 99 F.3d 635, 638 (4th Cir.1996); *United States v. A.S. Holcomb,* 651 F.2d 231, 236 (4th Cir.1981).

#### A. Standard of Review for Factual Findings

In the absence of a statutory authority defining the type of review, "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Clark v. Alexander,* 85 F.3d 146, 151–52 (4th Cir.1996) (looking to the APA and applying a federal standard of review where relevant federal statute contained no explicit standard of review); *Guaranty Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.,* 794 F.2d 1339, 1342 (8th Cir.1986) (proper to look to the APA and apply the arbitrary and capricious standard where statute did not define the type of review).

Under this standard, a court evaluates the agency's decision to determine whether relevant factors support that decision and whether the agency has made a clear error of

judgment. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). A court may only uphold agency actions on the basis articulated by the agency itself. *See Motor Vehicle Mfrs. Ass'n, v. State Farm Mut.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Therefore, a court must find a rational connection between the facts found and the decision rendered. *Id.* at 43, 103 S.Ct. 2856.

### B. Standard of Review for Legal Determinations

▬ The federal district court must determine whether state commission. statements and agreements meet the requirements of section 251 of the 1996 Act. 47 U.S.C. § 252(e)(6). While courts may grant a level of deference to a federal agency's interpretation of federal law, the same does not apply to state commissions. *See Ritter v. Cecil County Office of Hous. & Comm. Dev.*, 33 F.3d 323, 327–28 (4th Cir.1994) (granting some deference. to the state agency's legal interpretation of federal law because that interpretation had been reviewed and approved by the Department of Housing and Urban Development). Therefore, the court reviews *de novo* whether a state agency's interpretation of the 1996 Act is consistent with federal law. *Id.* at 328.

### Issues Before the Court

The issues presented in the case at bar fall under one of two categories. First, the Court must examine the consistency between the SCC's pricing determinations and the 1996 Act. The issues related to this category include the wholesale discount rate, the use of the forward looking cost methodology and GTE's Taking claim. The second category relates to the effect of binding FCC Regulations on GTE's non-pricing claims. Within this claim are issues relating to the rebundling of network elements to evade resale provisions, ordering GTE to sell at wholesale prices services beyond the scop of 47 U.S.C. § 251(c)(4) and an alleged unlawful expansion of the duty to provide collocation. The Court shall address these issues in turn.

### Cross Motions for Summary Judgment

#### A. Consistency Between Pricing Determinations and the 1996 Act

Given its reservations on setting permanent prices without complete data, the SCC set interim prices pending receipt of additional information. R. pp. 29444–45 (interim wholesale discount), and pp. 29450–51 (interim prices for unbundled elements). GTE has not shown that the SCC erroneously interpreted the 1996 Act. As noted above, the arguments presented in the cross motions for summary judgment focus on the wholesale discount rate set by the SCC, the forward-looking cost methodology adopted by the SCC, and the "taking" of GTE's property without just compensation.

##### (1) Count I(A): Wholesale Price of Services for Resale

Section 252(d)(3) provides a formula for calculating wholesale rates. "A State commission shall determine wholesale rates on the basis of retail rates charge[d] to subscribers for the telecommunications services requested, excluding the portion thereof attributable to any marketing, billing, collection and other costs that will be avoided by the local exchange carrier." 47 U.S.C. § 252(d)(3). GTE challenges the SCC determination of the wholesale discount rate on three grounds which the Court shall review under the arbitrary or capricious standard. First, GTE claims that the SCC falsely assumed that it would exit the retail market completely in setting the wholesale discount rate. Second, GTE argues that the SCC committed legal error in rejecting GTE's evidence of actual costs GTE will avoid and improperly relied on information which was neither state specific nor GTE specific. Finally, GTE contends that the SCC erred by refusing to set different prices for different services. GTE's arguments are without merit. The SCC's effort to reach the wholesale discount rate was well thought out with § 252(d)(3) firmly in mind.

##### (a) False Assumptions Regarding GTE's Continued Participation in the Market

The SCC properly applied the "wholesale only" construct. The SCC used the model to

identify reasonably avoided costs as it pertains to GTE's provision of wholesale services. This is essential inasmuch as GTE offers telephone services at retail and wholesale. GTE's cost of services associated with the provision of retail services should not be used to establish the wholesale discount rate. The only revenue GTE loses by providing wholesale services will be offset by reductions in cost for the same. The "wholesale only" model properly envisions this paradigm; otherwise, wholesale purchasers would be forced to subsidize GTE's retail services in violation of § 252(d)(3). Such an anticompetitive subsidy would not comport with the goal of the 1996 Act to increase competition in local markets.

█ The SCC calculation of the wholesale discount rate was not arbitrary and capricious. In its Consolidated Order, the SCC explains the process by which it calculated the 20.6% discount when GTE provides directory assistance and call completion services and the 23.4% discount when GTE does not furnish those services. The SCC Staff examined GTE's expense categories to determine which categories would be eliminated. Rec. pp. P–329–32, 337–40 (Staff Report—Wholesale, pp. 7–9, 15–18). The SCC reviewed its Staff findings and methodology and made adjustments where appropriate. Rec. 5432–34; Consolidated Order, pp. 4–6. The Record and the Consolidated Order indicates a reasoned and reasonable approach to setting the wholesale discount rate.

(b) Legal Error in Rejecting GTE's Evidence of Actual Costs

█ The 1996 Act does not require the SCC to accept the incumbent local exchange carrier's cost study. Instead, the 1996 Act permits the SCC to arbitrate the matters submitted for its consideration. A hallmark of effective arbitration involves evaluation and circulation of relevant information. As arbitrator, the SCC was under no obligation to accept GTE's evidence. The Record reveals the SCC's carefully consideration of

competing facts and its reasoned selection of the best data.

The SCC properly relied on "data that is Virginia specific or at least tailored for Virginia." Rec. 5431; Consolidated Order, p. 3. As a state commission, the SCC should attend to setting rates which reflect costs associated with providing wholesale service in Virginia. Indeed, focus on Virginia specific information minimizes the potential for distortions. See GTE Mem. Tab 3, p. 183. Despite GTE's argument to the contrary, the Record indicates a consistent use of Virginia specific information. Staff member and witness, Mr. Cody, used Virginia-specific data for every other expense category for which it was available. SCC Mem. in Opposition, p. 20 (citing Rec. pp. 1408–12, 1455 (SCC Staff Witness Cody); Rec., pp. P–357 (Attachment 9 to Staff Report—Wholesale); Rec., p. 1203; Rec. pp. 1390–91 (AT & T witness Dionne) (criticizing GTE's use of nationwide data)). Moreover, all parties except GTE used GTE Virginia specific data submitted to the FCC to calculate avoided cost. When necessary, SCC Staff secured additional information directly from GTE. Rec. 17266; Tr. (November 19, 1996) at 181 (Cody (Staff)). To the extent GTE's cost study did not provide Virginia specific information, the SCC properly disregarded that information where specific information was available.

█ In all other respects, the Record offers ample evidence to support SCC determinations. To reach its conclusions, the SCC juxtaposed all of the information and studies the parties and its own staff presented. As opposed to arbitrarily or capriciously adopting one study or argument over another, the SCC's Order indicates a reasoned approach to calculating the wholesale discount rate. The SCC explains, "As a result of treating all the accounts as indicated above, we calculate the wholesale discount by placing the total avoidable costs in the numerator and dividing by a denominator consisting of revenue corresponding to the services represented in the numerator." Rec. 5435; Consolidated Order, p. 7.[4] The SCC's decision to rely on Virginia

---

4. The application of this formula properly disregarded GTE's attempt to secure "resale opportunity costs" because there is no statutory basis to

account for these costs. Moreover, these costs are analogous to future profits which if awarded

specific information, which resulted in a disregard for GTE's cost study, was not arbitrary and capricious.

### (c) Refusing to Set Different Prices for Different Services

■ The 1996 Act neither forbids nor mandates setting the wholesale discount on a "service-by-service" basis. GTE has failed to cite any controlling case law which would indicate otherwise. Moreover, even GTE proposed a single discount rate in connection with its "modified" cost analysis. Rec. 17230–31; Tr. (Nov. 19, 1996) at 185–186 (Wellemeyer (GTE)). As noted above, the SCC calculated a discount of 20.6% when GTE provides directory assistance and call completion services and 23.4% when GTE does not. Rec. 5435; Consolidated Order, p. 7. While the SCC did not set rates on a "service-by service" basis, the adoption of two discount rates provides evidence of the SCC's consideration of factors which would warrant separate rates. The Record indicates no SCC predisposition against setting the wholesale discount rate on a "service-by-service" basis. In sum, as long as the wholesale discount rate or rates are not in conflict with the policy behind the 1996 Act, the SCC could use a basis other than "service-by-service" to arrive at the discount rate. The Court GRANTS summary judgment for the SCC on the issue of the wholesale discount rate because the Court finds that the SCC did not act in an arbitrary or capricious manner in reaching the rates. The Court has reviewed and now AFFIRMS the SCC's determinations.

### (2) Count I(B)–(J): Forward Looking Cost Methodology

The State commission shall determine pricing standards for interconnection and network element charges which are just and reasonable. 47 U.S.C. § 252(d)(1). This section further provides that the rate shall be based on the cost of providing the interconnection or network element, be nondiscriminatory and may include a reasonable profit.

47 U.S.C. § 251(d)(1)(A)–(B). GTE challenges the use of forward-looking costs for three reasons. First, GTE contends the Hatfield-based prices do not compensate GTE for its incremental costs. Next, GTE argues that SCC Staff adjustments to the Hatfield-based model fail to correct "fatal flaws" within the model. Finally, GTE alleges that the SCC failed to account for its historical costs in violation of the 1996 Act. As discussed below, GTE's arguments are without merit.

### (a) Procedurally Abandoned Claims

■ To secure summary judgment, a party must assert the grounds alleged in the complaint; otherwise, they are deemed abandoned. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995) (internal citations omitted). The Court is under no obligation to fathom all the possible arguments based on the information and pleadings before it. *Id.* Rather, that obligation falls on the party moving for summary judgment. *Id.* GTE has failed to assert certain claims which the Court shall consider abandoned. Specifically, GTE has failed to assert or offer any argument supporting summary judgment for the following claims: Count I(C): Price of Transport and Termination; Count I(D): Price of Additional Features and Functions; Count I(E): Non-recurring Charges; Count I(F): End–User Surcharge; Count I(G): Price of Interim Number Portability; Count I(H): Price of Collocation; Count I(I): Price of Access to Poles, Ducts, Conduits and Rights of Way. Similarly, GTE has defaulted on certain claims within the remaining counts. These include in Count I(A), ¶¶ 96(c), (e), (f); Count I(B), ¶¶ 100, 100(b), 100(c), 100(e)–(g), 100(i), 102. The Court GRANTS summary judgment for the Defendants on these claims.

### (b) The Hatfield Based Model or HAI Model [5]

Initially, the Hatfield Model calculated the Total Service Long Run Incremental Cost

---

would have a chilling effect on competition in local markets.

**5.** The firm that developed prior versions of the Hatfield Model, Hatfield Associates, Inc., no longer performs telecommunications consulting.

for basic local telephone service. Utilizing the "greenfield" methodology, this model assumed all network facilities would be built without consideration of the location of existing wire centers. HAI later compared its model to a model developed by MCI, NYNEX, Sprint and U.S. West called the Benchmark Cost Model and incorporated certain loop investment data. These adjustments replaced HAI's greenfield model with the "scorched node" methodology of assuming that network wire centers would remain in their current locations. In 1996, HAI further expanded the HAI Model to estimate the costs of UNEs based on forward-looking economic costs. HAI submitted its model to the FCC which the FCC placed into the record of CC–Docket No. 96–45 to assist it in determining the forward-looking economic costs of universal service. *See* HAI Model, Release 5.0a, Model Description (February 2, 1998), Appendix A, p. 1. In its subsequent orders, the FCC adopted a methodology termed the "Total Element Long Run Incremental Cost" ("TELRIC") which is consistent with the methodology of the HAI Model. Both, AT & T and MCI relied on the HAI Model to calculate prices for unbundled network elements in cases pending before state commissions including Virginia's State Corporation Commission.

In addition to the HAI Model, the SCC considered two additional alternatives. GTE submitted a TELRIC model which utilized a Market-determined Efficient Component Pricing Rule ("M–ECPR") methodology. The SCC also considered its Staff model which was based on the HAI Model but offered certain modifications to account for perceived weaknesses in the HAI Model. The SCC found the evidence presented by advocates of each model insufficient to choose either and adopted its Staff's modified model. Consolidated Order, p. 10; Rec. 5438.

The Court reviews the SCC's decision under the arbitrary and capricious standard

and finds no violation. According to its Consolidated Order, GTE failed to heed requests for access to its model. Consolidated Order, p. 8; Rec. 5436. The parties and the Commission Staff sought "to determine the reasonableness or validity of its assumptions and inputs, or to run it with revised input data and assumptions." *Id.* at 9, Rec. 5437. Unable to do so, the model was labeled a "black box" because its operation and assumptions could not be tested or effectively challenged by others. *Id.* The Consolidated Order further indicates that the SCC considered the parties' respective criticisms before determining the applicable model. *Id.* at 10, Rec. 5438. Indeed, the meritorious criticisms of each proffered model and the limited record in the proceeding supported the emergence of the Staff model as "the only reasonable option presented for unbundled network elements." *Id.*

Both GTE and the defendants criticize the opposing party's cost studies. GTE further challenges the adoption of the Staff adjusted HAI model. GTE highlights certain "fatal flaws" based on the fill factors [6] and assert that the model violates the 1996 Act because it is not compensatory. GTE cites the SCC's failure to explain its reasons for not modifying the Staff based model as arbitrary and capricious. These criticisms and challenges are most relevant to the proceedings for developing a permanent rate.

■ Nonetheless, the SCC's decision to adopt the modified HAI model as presented by its Staff was not arbitrary and capricious. Section 252(b)(4)(c) imposed a ninety day deadline to resolve the unresolved issues pertaining to the unbundled network element and the interconnection prices. The Consolidated Order indicates due consideration of GTE and the defendants' criticism. The SCC notes, "[T]he models presented each have flaws, and there was limited time and opportunity for analysis and possible modification of the models by the parties, the Staff,

---

The staff of Hatfield Associates, Inc. who were actively involved in developing the Hatfield Model have formed a successor firm, HAI Consulting, Inc.("HAI"), which continues to improve and upgrade the Hatfield Model. The model is now named the HAI Model. HAI Model, Release

5.0a, Model Description (February 2, 1998), p. 1 n. 1.

6. "Fill Factors" are the proportion of a telecommunications device which is actually in use.

and the Commission." Consolidated Order, p. 11; Rec. 5439. The SCC properly balanced the interests of the parties and the 1996 Act's time constraints when setting the interim prices.

GTE's criticisms of the HAI model may be presented to the SCC during the process for setting permanent rates. As the SCC explained, "Although, in the current proceeding, the Staff's proposed rates are based on outputs of the Hatfield [HAI] model, the Commission's decision herein is not an approval of the Hatfield model for purposes of determining permanent rates." Consolidated Order, p. 11; Rec. 5439. The SCC has not foreclosed the application of other cost models provided GTE and all other parties "make their models readily available to the parties to operate and include Virginia-specific data to the extent practicable and appropriate." *Id.* In this regard, GTE's challenge is premature. The Court GRANTS summary judgment for the SCC on this claim.

■ However, the SCC did find as a matter of law that the M–ECPR is not consistent with § 252(d)(1) of the 1996 Act and the Court shall review this determination *de novo.* *See* Consolidated Order, p. 12; Rec. 5440. As discussed above, § 252(d)(1) directs rates for network elements and interconnection agreements based on cost and possibly including a reasonable profit. Besides its provision that costs be "determined without reference to a rate-of-return or other rate-based proceeding," section 252 places no qualifiers on the term "cost." However, the absence of a qualifier does not grant a license to include any cost the ILEC seeks to recover. Instead, relevant costs are those which are consistent with the goal of the 1996 Act to increase competition in local markets.

GTE's M–ECPR method is based on the sum of its TELRIC plus its opportunity costs, as constrained by market forces. GTE seeks "opportunity costs" to insulate it from market-based losses while capturing all of its expected profits and revenues. As applied, this method can increase cost to the LEC.[7] The SCC properly notes, "Prices set at a market-determined level as envisioned by the M–ECPR method could actually result in over or under recovery of costs because the market-based price could be above or below GTE's cost." Consolidated Order, 12; Rec. 5440. Moreover, the FCC has explained "The existing retail prices used to calculate GTE's incremental opportunity costs under ECPR are not cost based." *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* 11 F.C.C.R. 3195 (1996) ("Local Competition Order") at ¶ 709. Therefore, allowing opportunity costs impedes progress towards greater competition by sustaining GTE's monopoly revenue.

■ The Court agrees with the SCC and FINDS as a matter of law that the MECPR methodology violates 47 U.S.C. § 252(d)(1).

### (c) Historical Costs

GTE argues that the forward-looking TELRIC model precludes recovery of historical costs because it is based on incremental costs.[8] According to GTE, this pricing methodology violates the 1996 Act because it is not based on all of GTE's costs. GTE considers historical costs, real costs, inasmuch as they are a cost of providing a particular service. Additionally, GTE interprets § 252(d) of the 1996 Act as requiring recovery of historical costs because Congress did

---

7. "Assume a 'monopoly input' with TELRIC of $3. Assume further that the remaining cost of retailing a service with that input is also $3, and that the current retail price is $10. In this setting, the M–ECPR price of the input is $7 ($3 for the TELRIC plus $4 for the opportunity cost). Thus an entrant can obtain input for $7." GTE's Post–Hearing Brief, p. 28. R. 3859. Excluding opportunity cost would result in a total cost of $6.00.

8. AT & T offers a concise definition of "forward looking" costs and "historic costs."

"Forward-looking" costs and "historic" cost are simply two different ways to estimate "cost" of the same wires and equipment. The forward-looking approach is premised on the fact that the cost of providing facilities today is their replacement cost—the true economic cost that constrains rates in competitive markets—not what was spent in the past. The historic cost approach, by contrast, looks to the company's accounting books and is based on the level of expenditures (less depreciation). AT & T's Brief in Support of Its Motion for Summary Judgment, p. 12.

not expressly act to limit or deny historical costs. GTE further supports this interpretation by reference to the provision allowing for a reasonable profit to argue that a profit could not be obtained without an accounting of all costs. Finally, GTE argues that disallowance of historical costs prevents it from recovering a fair rate of return to its investors.

 This Court may not consider arguments not raised before the administrative agency involved. *See Pleasant Valley Hosp. v. Shalala*, 32 F.3d 67, 70 (4th Cir.1994). As previously held, this Court's review is limited to the administrative record below. Order at 2, *GTE South, Inc. v. Morrison et al.*, 97CV493, (December 17, 1997). As a matter of fact, the administrative record reveals that GTE advocated a forward-looking measure of cost before the SCC. "GTE's cost studies, by contrast, are firmly and reliably rooted in the realities of GTE's operations on a forward looking basis." GTE's Post–Hearing Brief on Cost and Pricing, p. 7; Rec. 3838; *see also, id.* at 10, Rec. 3840 ("GTE's cost study results are forward-looking. They represent, to the extent possible, the future costs expected to be incurred by GTE."); Pricing Order at 7–8; Rec. 5435–36 ("GTE argued that its cost model represented GTE's forward-looking costs, or Total Element Long Run Incremental Costs."). Based on these prior concessions, GTE has waived its right to argue for historical costs.

 Nevertheless, § 252(d)(1)(A) is best read as not allowing historical costs. First, § 252(d)(1) does not provide for recovery of historical cost but excludes it. Costs shall be "determined without reference to a rate-of-return or other rate-based proceeding." § 252(d)(1)(A). Historical costs are determined in a rate-of-return or other rate based proceeding. *See Illinois Bell Telephone Co. v. F.C.C.*, 988 F.2d 1254, 1258–59 (D.C.Cir. 1993). Therefore, they are excluded by § 252(d)(1)(A). GTE argues that § 252(d)(1)(A) only limits the type of proceeding as opposed to excluding historical

costs altogether. However, GTE has failed to offer a credible alternative for determining historical costs.

Next, GTE urges this Court to construe § 252(d)(1) in a manner which gives effect to all of its provisions as opposed to an interpretation which would render certain provisions superfluous. GTE's Opposition to Defendants' Motion for Summary Judgment, p. 13 (citing *Pennsylvania Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 562, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990)). While true, the Supreme Court has also recognized a court's duty to refrain from reading a phrase into a statute when Congress has left it out. *Keene Corp. v. U.S.*, 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993). Courts must recognize that Congress acts intentionally and purposely in the disparate inclusion or exclusion of particular language. *See, Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). Although Congress defined cost as "actual capital cost" in § 254(d)(1), Congress did not offer such specificity with regard to "cost" as used in § 252(d)(1)(A). Having indicated its willingness to define or otherwise modify the term "cost," the Court declines to read into § 252(d)(1)(A), a term Congress has not explicitly included.[9]

GTE offers three additional misplaced arguments for including historical cost. First, GTE contends that the statute provides for a reasonable profit which logically could not occur unless all of GTE's cost were taken into consideration. Next, GTE relies on *Iowa* to support its claim that the rates must reflect its "actual" costs and requires the historical cost approach. Third, GTE attempts to deduce the meaning of "cost" in § 251(d)(1) based on its use in the Rail Passenger Service Act ("RPSA").

The forward-looking cost methodology can provide GTE the opportunity to earn a "reasonable" profit because it includes a forward-looking cost of capital as well as the costs of purchasing, installing, maintaining and operating the necessary assets. *See* AT & T

---

9. As early as 1944, Congress had notice that courts will not interpret "just and reasonable" as mandating the use of a specific cost method. *See Federal Power Comm'n v. Hope Natural Gas Co.*,

320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944) ("Under the statutory standard of 'just and reasonable' it is the result reached and not the method employed which is controlling.").

Motion for Summary Judgment, p. 24 (citing AT & T Arb. Ex. ATT/TLM–30 (Murray) at 13–14; R. 7753–54). The forward-looking cost of capital is equal to a normal profit which suffices for purposes of § 252(d)(1). *See* Local Competition Order ¶ 700. As the Seventh Circuit notes in *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1117 (7th Cir.1983), "long-run incremental cost has been approved as an economically relevant measure of average total cost." Historical costs are not relevant because they are "sunk", unavoidable and bear little relation to current pricing decisions. *Id.* at 1117.

GTE mistakenly relies on *Iowa Utilities Board v. FCC,* 120 F.3d 753 (8th Cir.1997) and *National R.R. Passenger Corp. v. ICC,* 610 F.2d 865, 872 (D.C.Cir.1979) (discussing the Rail Passenger Service Act, 45 U.S.C. § 562(a) (the "RPSA")). The Eight Circuit's decision in *Iowa* does not support GTE's claim for an award of "actual costs" based on the historical cost approach. The Eight Circuit declined to review the pricing rules on their merits, *Iowa,* 120 F.3d at 800. The circuit court vacated the FCC pricing rules on jurisdictional grounds. *Id.* Consequently, the underlying pricing methodology remains valid and instructive. GTE's reference to other portions of the opinion is similarly unavailing.[10] Nothing in *Iowa* requires an historical cost approach. Similarly, the RPSA does not support GTE's position. It is not relevant in this context because interpretive inferences should be drawn from different sections in the same Act as opposed to different Acts. *See Russello,* 464 U.S. at 23, 104 S.Ct. 296. To the extent the RPSA parallels the 1996 Act, those similarities are second to interpretive inferences which may be drawn within the 1996 Act. As discussed above, Congress did not expressly define or modify cost in § 252(d)(1)(A) and the Court is under no obligation to read into the statute what Congress has left out.

Not only did GTE fail to argue for recovery of historical costs as it pertains to the cost of providing interconnection or network elements, the arguments it now presents to this Court are unavailing. Section 252(d)(1) is best read as not allowing historical cost. The Court GRANTS summary judgment for the SCC on this claim.

## GTE's Taking Claim

According to GTE, the SCC's approval of the agreement effects an unconstitutional taking. Two elements of a ripe takings claim include: (1) the administrative agency has arrived at a final, definitive position regarding how it will apply the regulation at issue; and (2) the plaintiff has sought compensation through the procedures the State has provided. *Williamson Co. Regional Planning v. Hamilton Bank,* 473 U.S. 172, 191, 194, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). Neither element is present in the case at bar. The SCC has only set interim rates and GTE has not sought just compensation through existing statutory mechanisms. Accordingly, the Court DISMISSES GTE's taking claim WITHOUT PREJUDICE.

## The Effect of Binding FCC Regulations on GTE's Non-Pricing Claim

GTE challenges the Commission's determinations and the Interconnection Agreement on seven non-price operational issues which according to GTE violates sections 251 and 252 of the 1996 Act. This Court's October 22, 1997 Order dismissed without prejudice four of the seven claims which were not ripe for adjudication. The remaining three claims, now challenged on summary judgment, include: Count II(A)—Allowing "Rebundling" of Network Elements to Evade Resale Provisions; Count II(C)—Ordering GTE to Sell at Wholesale Prices Services Beyond the Scope

---

10. GTE attempts to justify an award of historical costs on the Eighth Circuit's statement, "We also agree with the petitioner's view that subsection 251(c)(3) implicitly requires unbundled access only to an incumbent LEC's existing network—not to a yet unbuilt superior one." *Iowa,* 120 F.3d at 813. GTE has offered this statement out of context. This statement occurs in the circuit

court's discussion of the FCC's unbundling rules. The circuit court rejected the FCC rule which requires superior quality when requested because it was not supported by the language of the 1996 Act. *Id.* at 812–813. This statement offers no direction on the relevance of historical costs in pricing.

of Section 251(c)(4); and Count II(E)—Unlawful Expansion of Duty to Provide Collocation. The Court shall consider each in turn.

#### (1) Allowing "Rebundling" of Network Elements to Evade Resale Provisions

According to GTE, the SCC's determinations impermissibly allow competing local exchange carriers ("CLECs") such as Cox, AT & T and MCI to evade the 1996 Act's pricing standards and other restrictions governing the purchase of retail services for resale. GTE propounds that these provisions violate sections 251(c)(4) and 252(d)(3) by allowing CLECs "to purchase all network elements necessary to provide completed telephone service on an unbundled basis and to 'rebundle' them to provide completed local telephone service." Complaint ¶ 136. GTE challenges the Commission's determinations as arbitrary and capricious and unsupported by the record. Complaint ¶ 138.

■ This claim is not ripe for the Court's consideration because GTE did not pursue it before the SCC; therefore, the Interconnection Agreement does not address it. The Court DISMISSES Claim II(A) WITHOUT PREJUDICE.

Without deciding the merits of this claim, it is the Court's opinion that FCC regulations and federal law would bar GTE's claim. Pursuant to 47 CFR § 51.315(a), "[a]n incumbent LEC shall provide unbundled network elements in a manner that allows requesting telecommunications carriers to combine such network elements in order to provide a telecommunications service." 47 CFR § 51.315(a). Moreover, according to the FCC's Local Competition Order, carriers are not required to own facilities in order to gain access to unbundled elements. *See Local Competiton Order*, CC Docket No. 96–98 at ¶ 330. Furthermore, in *Iowa*, the court considered and rejected a similar argument. The Eighth Circuit held that "a requesting carrier is entitled to gain access to all of the unbundled elements that, when combined by the requesting carrier, are sufficient to enable the requesting carrier to provide tele-

communications services." *Iowa*, 120 F.3d at 815.

Had the Court reached the merits of this claim, it would be compelled to award summary judgment for the Defendants.

#### (2) Ordering GTE to Sell at Wholesale Prices Services Beyond the Scope of Section 251(c)(4)

GTE contends that SCC's determinations unlawfully expand the scope of GTE's duty to offer services at wholesale prices. According to GTE, § 251(c)(4) requires it to offer for resale at wholesale prices "only those telecommunications services that [it] provides at retail to subscribers who are not telecommunications carriers." Complaint ¶ 148 (internal quotations omitted). By imposing a duty to sell below-cost services, promotional services, individual case services, services to the disabled, public and pay phone lines, GTE argues that the SCC has transcended the legitimate scope of § 251(c). The Court reviews the legal scope of the SCC's actions *de novo*.

■ Given the FCC's *Local Competition Order* and the Eight Circuit's decision in *Iowa*, GTE's argument lacks merit. The FCC expressly "decline[d] to limit the resale obligations with respect to certain services where the 1996 Act does not specifically do so." *Local Competition Order* at ¶ 956.[11] Moreover, the FCC's interpretation of § 251(c)(4) and rulings contradict GTE's argument. Section 251(c)(4), according to the FCC, "makes no exception for promotional or discounted offerings, including contract and other customer specific offerings." *Local Competition Order* at ¶ 948. Additionally, "below cost services are subject to the wholesale rate obligation under section 251(c)(4)," *Id.* at ¶ 956. Finally, the FCC held "that the services independent public pay phone providers obtain from incumbent LECs ... should be available at wholesale rates to telecommunications carriers." *Id.* at ¶ 876. The Eighth Circuit has upheld the FCC's jurisdiction to issue these rulings. *Iowa*, 120

---

**11.** The 1996 Act does not limit the resale obligations with respect to any of the services GTE

has highlighted.

F.3d at 819. The FCC Order and the Eighth Circuit's decision categorically reject GTE's argument to the contrary.

The Court FINDS that the SCC acted within the scope of § 251(c) and GRANTS summary judgment on its behalf.

### (3) Unlawful Expansion of the Duty to Provide Collocation

GTE challenges the SCC's determinations for impermissibly allowing collocators to provide their own interconnection facilities if their collocating cages abut one another. *See* Complaint ¶ 157(d). According to GTE, this determination violates § 251(c)(6) of the Act which allows an incumbent LEC to provide for "virtual collocation" where it has demonstrated that physical collocation is not practical. *See id.* at ¶ 155. GTE contends that the effect of the SCC determination amounts to a taking of its property within the meaning of the Fifth and the Fourteenth Amendments. GTE argues in favor of a narrow reading of § 251(c)(6) in order to avoid an unauthorized taking of its property.

 Notwithstanding GTE's argument, the SCC's determination is in accord with federal law. A binding FCC rule requires:

> an incumbent LEC [to] permit a collocating telecommunications carrier to interconnect its network with that of another collocating telecommunications carrier at the incumbent LEC's premises and to connect its collocated equipment of another tele-communications carrier within the same premises.

47 C.F.R. § 51.323(h). A narrow reading of the section would not comport with this binding FCC rule or the Eight Circuit's ruling upholding the rule. *See Iowa,* 120 F.3d at 818 & n. 38.

Moreover, the Cox Order provides that GTE shall abut collocation facilities where "feasible and where space permits." Cox Order at ¶ 1 (Rec.5453). This language does not mirror a taking in which the property owner has no control. Where collocation cages do directly abut one another, the Cox Order limits collocators right to provide their own interconnection facilities. Such connections are limited to "circumstances that do not adversely impact GTE's coordination and technical management of the collocation space." Cox Order at ¶ 1 (Rec.5454–53).

The SCC properly applied federal law in its determination that these provisions promote competition while protecting GTE's interest. The Court GRANTS summary judgment for the SCC on this issue.

### CONCLUSION

In conclusion, the Court GRANTS summary judgment for the SCC on all issues pending before this Court. There are no genuine issues as to material facts which would warrant proceeding to trial. The Court has applied the arbitrary and capricious standard to GTE's pricing claims and FINDS that the SCC articulated the basis for its decisions. The decisions are supported by substantial evidence in the Record. The SCC's decision to set interim prices for network elements and interconnection based on the forward-looking HAI model, as adjusted, was not arbitrary and capricious. Moreover, the SCC properly rejected GTE's cost study. The Court reviews *de novo* the SCC's determination that the MECPR pricing methodology violates the 1996 Act and FINDS that the MECPR pricing methodology does violate the 1996 Act as a matter of law. Furthermore, GTE is not entitled to historical costs because GTE failed to raise the matter before the SCC. Additionally, the Court FINDS that § 251(d)(1) is best read to exclude historical costs. GTE's taking claim is NOT RIPE for adjudication. With regards to GTE's non-pricing claims, the Court DISMISSES Count II(A) WITHOUT PREJUDICE because GTE did not pursue this claim in the proceedings below. Binding FCC regulations warrant summary judgment for the SCC on the remaining non-pricing claims. The Court DIRECTS implementation of the Interconnection Agreement as approved by the SCC.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

And it is SO ORDERED.