ESTATE OF Prasanna KALAHASTHI, Nadadur S. Kumar and Vartkes Kassouni, as Co–Administrators, Plaintiff,

v.

UNITED STATES of America, Defendant.

Case No. CV 07–05771 MMM (RCx).

United States District Court, C.D. California.

July 7, 2008.

Elliott H. Kajan, Lydia Bottome Turanchik, Kajan, Mather and Barish, Beverly Hills, CA, for Plaintiff.

Richard G. Stack, AUSA, Office of U.S. Attorney, Los Angeles, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MARGARET M. MORROW, District Judge.

On September 5, 2007, the Estate of Prasanna Kalahasthi filed this action challenging the government's refusal to tax Kalahasthi's estate at the reduced rate set forth in 26 U.S.C. § 2201(b)(2) and (c). Kalahasthi's husband was a passenger on one of the airplanes that was hijacked on September 11, 2001 and crashed into the World Trade Center. Five weeks after his death, Kalahasthi took her own life. Plaintiff claims that Kalahasthi should be considered a "victim" of the September 11, 2001 terrorist attacks as defined in 26 U.S.C. § 692(d)(4) and that it should be deemed eligible for reduced estate tax rates as a result. On May 9, 2008, plaintiff filed a motion for summary judgment. The government opposed the motion and filed a cross-motion on June 4, 2008. The question presented by both motions is whether Kalahasthi is properly considered a "victim" as that term is used in the statute. The facts relevant to this legal issue are undisputed.

## I. FACTUAL BACKGROUND

### A. Undisputed Facts

Pendyala Vamsikrishna and Kalahasthi were married on January 25, 1999.[1] At some point thereafter, they moved to the United States.[2] Vamsikrishna was a software engineer employed by DTI in Fre-

mont, California.[3] Kalahasthi was a licensed dentist in India, but she could not practice in the United States without significant additional schooling.[4] As a consequence, she enrolled as a graduate student at the University of Southern California ("USC") and remained a student there until she died.[5]

On September 11, 2001, Vamsikrishna was returning to Los Angeles from a business trip to Boston, Massachusetts. He was a passenger on American Airlines Flight 11 when it was hijacked and crashed into the north tower of the World Trade Center in New York. Vamsikrishna was killed immediately in the crash.[6]

Kalahasthi was devastated by her husband's death.[7] On October 17, 2001, she purchased a length of rope from Home Depot and on October 19, committed suicide by hanging herself.[8] Kalahasthi left two detailed suicide notes. The first, written to her brother, stated:

"I love Vamsi [Vamiskrishna] too much and the pain is excruciating[.] I am not able to deal with it. If there exists·any form after this life I will be with him[;] if not at least it will relieve me from this deep pain." [9]

The second note was written to Vamsikrishna's brother, and stated: "I am doing this since I love Vamsi too much and I don't want to make my life without him." [10] Kalahasthi also left an audio recording for her family in which she stated:

"I can't live without Vamsi, Sekhar. It's very tough for me. I loved him too

---

1. Plaintiff's Statement of Uncontroverted Facts ("Pl.'s Facts"), ¶ 3; Defendant's Statement of Genuine Issues ("Def.'s Issues"), ¶ 3.

2. Pl.'s Facts, ¶ 6; Def.'s Issues, ¶ 6.

3. Pl.'s Facts, ¶ 4; Def.'s Issues, ¶ 4.

4. Pl.'s Facts, ¶¶ 6–7; Def.'s Issues, ¶¶ 6–7.

5. Pl.'s Facts, ¶ 1; Def.'s Issues, ¶ 1.

6. Pl.'s Facts, ¶¶ 8–10; Def.'s Issues, ¶¶ 8–10.

7. Pl.'s Facts, ¶ 11; Def.'s Issues, ¶ 11.

8. Pl.'s Facts, ¶¶ 20–21; Def.'s Issues, ¶¶ 20–21.

9. Pl.'s Facts, ¶ 17; Def.'s Issues, ¶ 17.

10. Pl.'s Facts, ¶ 18; Def.'s Issues, ¶ 18.

much. I don't feel like ... I don't feel like living for anyone. I'm sorry, but I loved him too much. And the pain ... just can't take the pain. Hurts me too much." [11]

At the time of her death, Kalahasthi was a lawful resident alien of the United States and lived in California.[12] After Nadadur S. Kumar and Vartkes Kassouni were appointed co-executors of the estate, the probate court found that Kalahasthi's suicide notes were holographic wills.[13] The proceeds of the estate were ultimately split between her family and Vamsikrishna's family.[14] Plaintiff computed the estate tax due using the reduced rates set forth in 26 U.S.C. § 2201(b)(2). After examining the estate tax return, the IRS determined that plaintiff was not entitled to take advantage of the reduced rates, and assessed a deficiency of $669,552.68. Plaintiff paid the deficiency in October 2004. Thereafter, on November 21, 2005, plaintiff filed a claim for refund from the IRS, arguing that it should have been taxed at the reduced rate. On May 22, 2007, the IRS denied the claim, and on September 5, 2007, plaintiff instituted this suit.[15]

**B. Disputed Facts**

Although the parties dispute certain facts, none is relevant to resolution of the legal question presented by the cross-motions. The facts in dispute relate, *inter alia*, to the closeness of the bond between Kalahasthi and Vamsikrishna, and the extent of Kalahasthi's suffering as a result of her husband's death. Plaintiff asserts, for example, that Kalahasthi and Vamsikrishna were "an extraordinarily happy couple" and that Kalahasthi considered Vamsikrishna her "soulmate."[16] Plaintiff notes that Vamsikrishna called Kalahasthi as he was boarding Flight 11, and left a voicemail stating that he would be home by lunchtime. Plaintiff contends that Kalahasthi listened to this message "over and over and over again" after September 11.[17] The government purports to "dispute" these facts; in reality, however, it objects to most of them as "irrelevant and immaterial."[18] Apart from a minor dis-

11. Pl.'s Facts, ¶ 19; Def.'s Issues, ¶ 19.

12. Pl.'s Facts, ¶ 23; Def.'s Issues, ¶ 23.

13. Pl.'s Facts, ¶¶ 25–26; Def.'s Issues, ¶¶ 25–26.

14. Pl.'s Facts, ¶ 29; Def.'s Issues, ¶ 29. The estate was comprised primarily of insurance proceeds due on Vamsikrishna's death that passed into Kalahasthi's estate. (Pl.'s Facts, ¶ 28.) The parties dispute whether Vamsikrishna received any proceeds from the Victim's Compensation Fund; this dispute does not appear to be material to the issue before the court, however.

15. Pl.'s Facts, ¶¶ 31–36; Def.'s Issues, ¶¶ 31–36.

16. Pl.'s Facts, ¶ 5. Plaintiff also states that "[i]n the Hindu culture, the marital bond has a sanctity in which a devoted wife looks upon her spouse as the earthly embodiment of the Lord. The husband, in turn, venerates and looks upon his wife as a goddess of divine origin deserving of the highest respect and honor.... The respect and devotion between [Kalahasthi] and her husband was mutual, and was clear in [her] discussions of her husband." (Pl.'s Facts, ¶ 13.)

17. Pl.'s Facts, ¶ 12. Relatedly, plaintiff notes that Kalahasthi's telephone bill for the month following September 11 was more than $2,000, because she attempted to reach out to those around her to escape her sorrow. (*Id.,* ¶ 14.) In its memorandum, plaintiff asserts that Kalahasthi's grief was compounded by the fact that she was forced to relive the horror of the September 11 attacks over and over again because "[s]he could not escape the images of September 11, and ... they were devastating to her." (Plaintiff's Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Pl.'s Mem.") at 19.)

18. Def.'s Issues, ¶ 5. The government states that "the *only* issue to be decided in this case [is] whether plaintiff is a 'specified terrorist

pute regarding the amount of Kalahasthi's telephone bill,[19] the government's only substantive dispute concerns plaintiff's assertion that "[Kalahasthi's] suicide was a direct result of her husband's death."[20] The government contends this is a legal conclusion, and posits an alternate chain of causation in which Kalahasthi's depression following Vamsikrishna's death was an intervening factor contributing to her suicide.[21]

The parties also dispute the proper characterization of certain actions of the state probate court. Plaintiff asserts that the probate judge "determined that [Kalahasthi] was a victim of the September 11, 2001 tragedy."[22] The government counters that the probate court also stated that Kalahasthi "died as a result of an alleged suicide in Los Angeles," undermining plaintiff's suggestion that the court found the terrorist attacks were the direct cause of her death. The government also notes that the language cited by plaintiff was not drafted by the probate judge, but by counsel for one of the administrators of the estate after a non-adversarial hearing. Finally, the government notes that division of the estate—which was the purpose of the probate proceeding—did not require that the court determine the cause of Kalahasthi's death.[23]

■ Plaintiff's assertion that the state court determined Kalahasthi was a victim of the terrorist attacks misrepresents the import of court's holding. Even were this not true, however, and even had the probate court unequivocally determined that Kalahasthi was a victim of the attacks, the law is clear that such a state court determination is not binding for purposes of assessing federal estate taxes. See *United States v. Boulware*, 384 F.3d 794, 804 (9th Cir.2004) ("It is clear, therefore, that with regard to the calculation of estate taxes, federal courts are not bound by the judgments of a state probate court," citing *Estate of Rapp v. Comm'r*, 140 F.3d 1211, 1215–16 (9th Cir.1998)). For both reasons, the court accords no weight to plaintiff's assertion that the probate court determined that Kalahasthi was a victim of the terrorist attacks.[24]

Finally, plaintiff asserts that Kalahasthi and Vamsikrishna paid no income tax in 2001. This is not disputed.[25] Plaintiff suggests that the reason neither paid tax in 2001 was that, as victims of the September 11 attacks, their income tax liability was forgiven.[26] The government disputes this. The government acknowledges that it did not assess income tax against Vamsikrishna because he was clearly a "victim" of the terrorist attack. It asserts that the same is not true of Kalahasthi, because

victim' of the September 11, 2001 terrorist attacks, within the meaning of 26 U.S.C. § 692(d) (4), and therefore a 'qualified decedent' under Code § 2201(b), entitling her estate to receive the benefit of the reduced estate tax rates provided by Code § 2201(c)." (*Id.*) (emphasis original).

19. The government notes that plaintiff's evidence indicates that Kalahasthi owed only $1,536.24 at the time of her death, and asserts that plaintiff has overstated the volume of Kalahasthi's calls after September 11. (Def.'s Issues, ¶¶ 14–15.)

20. Pl.'s Facts, ¶ 22.

21. Def.'s Issues, ¶ 22.

22. Pl.'s Facts, ¶ 27.

23. Def.'s Issues, ¶ 27.

24. Recognizing that any decision of the issue by the state court would not be binding, plaintiff properly focuses its argument on the meaning of "victim" in the statutory definition.

25. Pl.'s Facts, ¶ 37; Def.'s Issues, ¶ 37.

26. Pl.'s Facts, ¶ 37.

Vamsikrishna's wages accounted for nearly all of the taxable income reported on the couple's joint return, and consequently it "did *not* allocate any of the tax liability [on this income] to Kalahasthi."[27] In the end, both parties acknowledge that the outcome of their motions turns on proper interpretation of "specified terrorist victim" as that term is used in 26 U.S.C. § 692(d)(4), and that the essential facts relevant to that inquiry are undisputed.[28] They agree the question is whether the statute contemplates that a spouse who commits suicide in response to the death of her husband in a terrorist attack can be considered a victim of the attack for tax purposes.[29]

## II. DISCUSSION

### A. Legal Standard Governing Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In judging evidence at the summary judgment stage, the court does not make

---

**27.** Def.'s Issues, ¶ 37; Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Opp.") at 8 (emphasis original).

**28.** See Pl.'s Mem. at 11 ("The primary issue to be decided is whether [Kalahasthi] was a 'victim' of the terrorist attacks under § 692(d)(2) of the Code, and thus entitled to application of the reduced rates provided for in §§ 2201(b)(2) and (c)"); Def.'s Opp. at 1 ("The sole disputed issue in this case is legal in nature; namely, whether decedent [Kalahasthi] is a "specified terrorist victim" ... as that term is defined in Section 692(d)(4) of the Internal Revenue Code ... and consequently, whether Kalahasthi is a 'qualified decedent' under 26 U.S.C. § 2201(b) entitling her estate to receive the benefit of the reduced estate tax rates contained in Code § 2201(c)").

**29.** Because this is the central and controlling question, the court agrees with the government that "this case is not about the intensity of Kalahasthi's love for her husband ... or the strength of the[ir] marriage and their religious and cultural traditions ..., but whether Kalahasthi died 'as a result' of th[e] terror attacks." (Def.'s Opp. at 1.) The government acknowledges that Vamsikrishna's death was a contributing cause of Kalahasthi's suicide, and does not appear to assert that other intervening factors resulted in her death. (See Def.'s Issues, ¶ 22 (suggesting that Vamsikrishna's death caused Kalahasthi to become depressed and that her ongoing depression, coupled with the loss of Vamsikrishna's companionship, caused Kalahasthi to commit suicide).) It contends, however, that, no matter how close the couple's relationship and no matter how deep their love, individuals in Kalahasthi's position are not eligible for tax relief under the statutory scheme.

credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in favor of the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987). The evidence presented by the parties must be admissible. FED.R.CIV.PROC. 56(e). In addition, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Thornhill Pub. Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979); see also *Falls Riverway Realty, Inc. v. Niagara Falls,* 754 F.2d 49, 56 (2d Cir.1985).

## B. The Relevant Statutory Scheme
### 1. The Victims of Terrorism Tax Relief Act of 2001

After the terrorist attacks of September 11, 2001, Congress passed the "Victims of Terrorism Tax Relief Act of 2001" ("VTTRA") to afford tax relief to victims of the attacks. See Pub.L. No. 107–143, § 101 et. seq., 115 Stat. 2427 (2002) (codified in various sections of the Internal Revenue Code). The act grants relief from income taxes (see 26 U.S.C. § 692(d)(2)); excludes certain death benefits from taxation (see 26 U.S.C. § 101(i)); reduces the estate tax rate (see 26 U.S.C. § 2201(b)(2)); excludes disaster relief payments from taxation (see 26 U.S.C. § 139); excludes certain cancellations of indebtedness from taxation (see 26 U.S.C. § 108); treats payments by charitable organizations arising from the death, injury or illness of an individual as related to the function that qualifies them as exempt (see 26 U.S.C. § 501); and delegates authority to the IRS to postpone certain deadlines for up to a year (see 26 U.S.C. § 7508A).[30]

As relevant here, the VTTRA provides that the estates of "qualified decedents" are taxed at a reduced rate according to the schedule set out in 26 U.S.C. § 2201(c). See 26 U.S.C. § 2201(a). The statute defines a "qualified decedent" as, *inter alia,* "any specified terrorist victim (as defined in section 692(d)(4))." 26 U.S.C. § 2201(b)(2).[31] Section 692(d) deals generally with income tax relief for victims of the terror attacks.[32] It defines a "specified terrorist victim" as

"any decedent—

(A) who dies as a result of wounds or injury incurred as a result of the terrorist attacks against the United States on April 19, 1995,[33] or September 11, 2001, or

(B) who dies as a result of illness incurred as a result of an attack involving anthrax occurring on or after Sep-

---

**30.** See Final Rule, Statement by the Special Master, 67 Fed.Reg. 11233, 11241 (March 13, 2002) ("The Victims of Terrorism Tax Relief Act of 2001 provides income and estate tax relief to the families of victims of terrorism. The law waives the income tax liability of a victim who died in one of the attacks for both the year of the attack and the previous year, and ensures that a minimum benefit of $10,000 is provided to the family of each victim. In addition, the law shields the first $8.5 million of a victim's estate from the federal estate tax"); Patrick E. Tolan, Jr., Tax and Insurance Consequences of Major Disasters: Weathering the Storm, 31 NOVA L.REV. 487, 501 (Summer 2007) (describing the provisions of the VTTRA).

**31.** The other individuals who are "qualified decedents" are: (1) citizens or residents of the United States who die while in active service of the Armed Forces either in action in a combat zone or as a result of wounds, disease, or injury suffered while serving in a combat zone; and (2) any astronaut whose death occurs in the line of duty. See 26 U.S.C. § 2201(b)(1 & 3).

**32.** Like § 2201, this statute also provides relief for members of the armed forces and astronauts who die in the line of duty. See 26 U.S.C. § 692(c).

**33.** This is the date of the attack on the Alfred P. Murrah building in Oklahoma City.

tember 11, 2001 and before January 1, 2002." 26 U.S.C. § 692(d)(4).

There is, as yet, no case law interpreting this definition. Specifically, no court has addressed the meaning of the terms "as a result of" and "wounds or injury incurred" as used in § 692(d)(4). Although there is no case law construing the definition, the Joint Committee Technical Explanation of the bill states, as respects the income tax exemption, that "[t]he exemption applies to these individuals whether killed in an attack (e.g., in the case of the September 11, 2001, attack in one of the four airplanes or on the ground) or in rescue or recovery operations." [34] Joint Committee on Taxation Staff, Technical Explanation of the "Victims of Terrorism Tax Relief Act of 2001," as Passed by the House and the Senate on December 20, 2001 ("Staff Report"), JCX–93–01 (December 21, 2001) at 6; [35] see 34A Federal Taxation Am.Jur.2d

**34.** Plaintiff notes that this portion of the report explains only the income tax provisions of the VTTRA, and that, although included in the first draft, the final version of the report contains no similar explanation of the estate tax provision. Plaintiff asserts the fact that the Joint Committee chose not to describe "specified terrorist victim" with reference to the estate tax provision demonstrates Congress's intent that a more expansive definition of the term apply for estate tax purposes. This argument fails given the statement in § 2201(b)(2) that the meaning of "specified terrorist victim" is "as defined in section 692(d)(4)." 26 U.S.C. § 2201(b)(2). To the extent that the Joint Committee report explains the definition set forth in § 692(d)(4), therefore, it also explains the definition to be used for purposes of § 2201. Plaintiff identifies no reason why Congress would have defined the term differently for income and estate tax purposes. Moreover, such an approach is contrary to general tenets of statutory interpretation. See *Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990) (noting the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning" (internal quotation marks omitted)); *Sun v. Ashcroft*, 370 F.3d 932, 938 (9th Cir.2004) (noting the "normal rule of statutory construction that identical words used in different part of the same act are intended to have the same meaning").

Not only is there no compelling reason for concluding that the term is defined differently for purposes of §§ 692 and 2201, but plaintiff's argument requires a large conjectural leap. If, as plaintiff asserts, Congress truly intended to expand the definition of "specified terrorist victim" as it is used in § 2201, surely it would have made such an intent explicit. Absent explicit expansion of the meaning of the term, the more likely reason for the omission of reference to the estate tax in the second draft of the report is that, given the fact that § 2201 incorporates by reference the definition contained in § 692, additional explanation would have been superfluous and duplicative. Especially in the context of a tax exemption, plaintiff's conjecture is too attenuated to be persuasive.

Consequently, to the extent the Joint Committee report assists in interpreting "specified terrorist victim" as used in § 692(d)(4), it is equally helpful in interpreting the term in § 2201(b)(2). See 34A Federal Taxation Am. Jur.2d ¶ 144,913 ("However, the language in the income tax section of the Technical Explanation presumably applies for purposes of the estate tax relief provision, because the statutory definition of individuals who qualify for relief (i.e., 'specified terrorist victims') is the same for both income tax and estate tax purposes").

**35.** Although courts have found that Joint Committee reports do "not rise to the level of legislative history, because [they were] authored by Congressional staff and not by Congress ... such explanations [are] highly indicative of what Congress did, in fact, intend." *Hutchinson v. Comm'r*, 765 F.2d 665, 670 (7th Cir.1985); see *Estate of Wallace v. C.I.R.* 965 F.2d 1038, 1050 n. 15 (11th Cir.1992) ("We cite the General Explanation not as an expression of legislative intent, as it was prepared by committee staff after enactment of the statute, but as a valuable aid to understanding the statute. We accord it no weight as binding authority on legislative intent"); *McDonald v. C.I.R.*, 764 F.2d 322, 336 n. 25 (5th Cir.1985) ("The Joint Committee is a staff committee, and its 'Explanation' was issued after the fact. Hence it does not directly represent the views

¶ 144,913 ("The definition of a 'specified terrorist victim' applies regardless of whether the individual was killed in the attack itself (e.g., in one of the four airplanes involved in the Sept. 11, 2001 attacks or on the ground) or in rescue or recovery operations").

## 2. Other September 11 Victim Compensation Statutes

The VTTRA is the only statute at issue here. Other statutes, however, were passed in the wake of the September 11, 2001 attacks and may provide interpretative guidance that will assist in construing the VTTRA. Most relevant is the "Air Transportation Safety and System Stabilization Act" ("ATSSSA"), Pub.L. No. 107–42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101 note). The Second Circuit described the relevant terms of the ATSSSA in *In re WTC Disaster Site*, 414 F.3d 352 (2d Cir.2005):

"Congress enacted the original version of ATSSSA within days after the September 11 attacks. The principal components of the original enactment were the creation of the Victim Compensation Fund ['VCF'] to provide relief, without litigation, to individuals (or relatives of deceased individuals) physically injured or killed as a result of the September 11 aircraft crashes, see ATSSSA §§ 403, 405; the limitation of the airlines' liabili-

ty for damages sustained as a result of those crashes, see *id.* § 408(a); the creation of a federal cause of action as the exclusive judicial remedy for damages arising out of those crashes, see *id.* § 408(b)(1); and the concentration in federal court in the Southern District of New York (or "Southern District") of suits on that federal cause of action, see *id.* § 408(b)(3)." *Id.* at 373.

As noted, "[o]ne purpose of the [VCF] is 'to provide compensation to any individual (or relatives of a deceased individual) who was physically injured or killed as a result of the terrorist-related aircraft crashes of September 11, 2001.'" *Virgilio v. City of New York*, 407 F.3d 105, 111 (2d Cir.2005) (quoting ATSSSA § 403). The VCF identifies two categories of claimants eligible for compensation. Most pertinent here, it defines an eligible individual as one who

"(i) was present at the World Trade Center, (New York, New York), the Pentagon (Arlington, Virginia), or the site of the aircraft crash at Shanksville, Pennsylvania at the time, or in the immediate aftermath, of the terrorist-related aircraft crashes of September 11, 2001; and

(ii) suffered physical harm or death as a result of such an air crash." ATSSSA § 405(c)(2)(A).[36]

ATSSSA provides for a federal cause of action arising out of the attacks that preempts all other claims.[37] The statute

of the legislators or an explanation available to them when acting on the bill. The Joint Committee's views, however, are entitled to great respect"); see also *Pierce v. United States*, 76 Fed.Cl. 638, 650 (Fed.Cl.2007) ("Congress' intent is also found in the Joint Committee's General Explanation of the Tax Reform Act of 1986 and Joint Committee's Technical Explanation of the Tax Relief and Health Care Act of 2006"); *United States v. One Parcel of Land, Known as Lot 111–B*, 902 F.2d 1443, 1445 (9th Cir.1990) ("A congressional joint committee report explaining the identical language of Section 881(a)(6) leaves no doubt as to the proper interpretation of the 'knew or consented' language").

36. The second category is individuals who were passengers or crew on any of the airplanes involved in the attacks, so long as they have not been found to be participants or conspirators in the attacks. See ATSSSA, § 405(c)(2)(B).

37. This further ATSSSA's purpose of "provid[ing] quick no-fault compensation decisions for victims while capping the litigation exposure of front-line defendants." *Virgilio*, 407 F.3d at 111; see *id.* ("it is quite clear that the Act's 'general purpose is to protect the airline industry and other potentially liable entities from financially fatal liabilities while ensuring that those injured or killed in the

states that "[t]here shall exist a Federal cause of action for damages arising out of the hijacking ... [and] this cause of action shall be the exclusive remedy for damages arising out of the hijacking and subsequent crashes of such flights." *Id.*, § 408(b)(1). Under § 408, "[t]he United States District Court for the Southern District of New York [has] exclusive jurisdiction over all actions brought for any claim ... resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001." *Id.*, § 408(b)(3).

As can be seen, the ATSSSA uses different phrases connoting causation in different provisions. Section 405, which defines those eligible to receive funds from the VCF, limits claimants to those who were present at the crash sites and suffered physical harm or death "as a result of" a crash. See *id.* § 405(c)(2)(A)(ii).[38] Section 408, however, recognizes a federal cause of action for damages "arising out of" the hijackings. See *id.*, § 408(b)(1). In a later subsection, Congress uses a third formulation, providing that the Southern District of New York has jurisdiction to hear claims "resulting from or relating to" the crashes. *Id.*, § 408(b)(3). In *WTC Disaster Site*, the Second Circuit analyzed the causal language used in §§ 405 and 408, noting that "the phrases used in §§ 405 and 408 are significantly different in describing the required relationship between the September 11 events and the claims that are the subjects of those sections." *WTC Disaster Site*, 414 F.3d at 376. The court held that § 408's use of "arising out of" and "relating to" was broader and more expansive than § 405's "as a result of." See *id.* ("Section 408 uses two broader concepts: (1) It creates a federal cause of action for damages 'arising out of'

the crashes, ... which encompasses a broader group of claims than does the phrase 'as a result of' the crashes; and (2) while § 405's 'as a result of' concept is repeated—as 'resulting from'—in the § 408 subsection that gives the federal court exclusive jurisdiction, § 408's operative phrase is 'resulting from or relating to' the crashes ... and a phrase such as 'relat[ing] to' is 'clearly expansive,'" quoting *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995)). The court thus concluded that "whereas § 405 relief is limited to injuries suffered 'as a result of' the air crashes, the scope of § 408, dealing with '*all* actions brought for *any* claim ... resulting from or *relating to*' the crashes, is clearly broader." *Id.* (emphasis added).

While the Second Circuit's interpretation of the ATSSSA does not bear directly on interpretation of the VTTRA, it is informative. First, as the parties note, an "eligible individual" under the VCF must have been "present" at one of the crash sites to recover. The VTTRA contains no such requirement. The VTTRA, however, defines "specified terrorist victims" as individuals who died "as a result of" wounds or injuries suffered "as a result of" the terrorist attacks. This, of course, is the same causal language used in the ATSSSA to define those individuals who can recover from the VCF.

## C. The Construction of Tax Exemption Statutes

■ It is a well settled rule of law that statutory tax deductions "depend[ ] upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed." *New Colonial Ice Co.*

---

terrorist attacks receive adequate compensation,'") quoting *Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG*, 335 F.3d 52, 55 (2d Cir.2003).

38. As discussed *infra*, VTTRA also uses "as a result of" to define the causal link that must exist for one to be a "specified terrorist victim." See 26 U.S.C. § 692(d)(4).

*v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934). "Because tax deductions are a matter of legislative grace, statutes providing for them should be narrowly construed against the taxpayer." *Strange v. C.I.R.,* 270 F.3d 786, 787 (9th Cir.2001). This rule applies with equal force to all types of federal taxation, including the federal estate tax. See *Davis v. C.I.R.,* 394 F.3d 1294, 1298 (9th Cir.2005) (noting that the marital deduction for federal estate tax purposes codified in 26 U.S.C. § 2056 "is 'to be strictly construed and applied,'" quoting *Comm'r v. Estate of Bosch,* 387 U.S. 456, 464, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967)); *Estate of Shedd v. Comm'r,* 237 F.2d 345, 357 (9th Cir.1956) ("[S]tatutory exemptions from [estate taxes] should be strictly construed against the taxpayer, and are held applicable only to subject matter or beneficiaries clearly within their terms").

As its title states, the VTTRA was intended to provide targeted "tax relief" to victims of the terrorist attacks. The government argues that the reduced tax schedule available to "specified terrorist victims" is clearly a tax deduction that must be "strictly construed" against the taxpayer. Although it did not clearly raise the argument in its reply, plaintiff asserted at oral argument that the "strict construction" rule does not apply because the tax relief afforded by the VTTRA is neither a deduction nor an exemption.[39] Rather, plaintiff contends, the VTTRA affords tax relief via a targeted reduction in the estate tax rate applicable to the estates of "speci-fied terrorist victims." Because the statute did not reduce the assets subject to tax, as a deduction or exemption would have, plaintiff maintains that the VTTRA is not subject to the strict construction rule.

■ Plaintiff concedes that it has no authority supporting this position, and after considering the argument, the court disagrees. As can be seen from the cases cited above, the rationale behind strict construction is that, where Congress affords individuals tax relief as a matter of "legislative grace," the extent of the relief should be narrowly construed. Stated differently, statutes granting tax relief are strictly construed in favor of the government because they constitute " 'a privilege granted by the Government.'" *Chrysler Corp. v. C.I.R.,* 436 F.3d 644, 654 (6th Cir.2006) (quoting *Burroughs Adding Mach. Co. v. Terwilliger,* 135 F.2d 608, 610 (6th Cir.1943)). Applying this rationale there is no principled distinction between the rate reduction at issue here and a tax deduction or exemption. Indeed, the lower tax rate in § 2201 is functionally indistinguishable from a tax exemption that reduces the size of a decedent's estate to which the standard tax rate applies. Either method provides targeted tax "relief" that is properly understood to be an act of "legislative grace." Cf. *Falcon Steel Co. v. C.I.R.,* 15 B.T.A. 1133, 1139 (B.T.A.1929) (Green, J., dissenting) ("I realize, of course, that section 327(d) is a relief provision and that, as such, it should be construed strictly").[40]

---

39. Plaintiff noted that "deductions and exemptions" generally reduce the amount of income or assets that are eligible for taxation and thus lower the amount of tax owed by decreasing the total pool of taxable income or assets to which the applicable tax rate applies.

40. Earlier cases dealing with tax exemptions for servicemen buttress the court's conclusion that the VTTRA should be interpreted narrow-ly. In *Estate of DuPont v. C.I.R.,* 18 T.C. 1134, 1952 WL 201 (Tax Court 1952), the decedent was a civilian working under military supervision who died in the crash of an experimental military glider. Applying a provision of the tax code that exempted servicemen's estates from tax if they died as a result of their active military service, the court held that the decedent was not in "active service" and thus did not qualify for the exemption

Because the reduced tax rate in § 2201 is equivalent to a tax deduction, strict construction is applicable. This means that any ambiguity in the statutory definition of "specified terrorist victim" must be resolved against Kalahasthi and in favor of the government. See *Consolidated Chollar Gould & Savage Min. Co. v. C.I.R.*, 133 F.2d 440, 441 (9th Cir.1943) ("[T]he ambiguity arising from the two possible rational interpretations must be resolved against the taxpayer seeking the deduction ... which must bring itself clearly within the area of legislative grace"); see also *BA Properties Inc. v. Government of U.S. Virgin Islands*, 299 F.3d 207, 220 (3d Cir. 2002) (where "the proper interpretation of [a tax exemption provision] is not 'so clear that there can neither be reasonable doubt nor controversy about its terms' ... that doubt 'must be resolved against the taxpayer'" (internal quotations omitted)). Moreover, plaintiff, as the taxpayer, "bears the burden of showing that [it] ... meets every condition of a tax exemption or deduction." *Davis*, 394 F.3d at 1298 n. 2 (citing *Deputy v. duPont*, 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416 (1940)).

As a consequence, plaintiff bears the burden of showing that the reduced estate tax rate set forth in § 2201(c) unambiguously applies to Kalahasthi's estate and cannot reasonably be interpreted in favor of the government. As discussed *infra,* plaintiff fails to meet this burden.

### D. Whether Kalahasthi was a "Qualified Decedent"

■ To qualify for the estate tax reduction it seeks, plaintiff must show that Kalahasthi was a "qualified decedent" for purposes of § 2201(b). This requires a showing, in turn, that Kalahasthi was a "specified terrorist victim" as that term is defined in § 692(d)(4). Plaintiff argues that Kalahasthi is "without question, a 'decedent who died as a result of wounds or injury incurred as a result of [September 11, 2001 attacks].'"[41] It bases this conclusion on assertions that (1) Kalahasthi need not have been present at the site of the attacks to be considered a "victim" and (2) Kalahasthi died "as a result" of the attacks. The government counters that the "plain language" of the statute excludes Kalahasthi because (1) she was never "wounded" or "injured" as those terms are used in the statute and (2) she did not commit suicide "as a result" of the attacks.

despite the fact that he was acting under military authority. See *id.* at 1142.

Likewise, the income tax relief provision in earlier versions of § 692 has been strictly interpreted as an exemption. See *Hampton v. United States*, 206 Ct.Cl. 422, 513 F.2d 1234 (1975). There, the widow of a deceased serviceman sought to recover taxes under a prior version of § 692. The provision authorized "additional tax relief in the case of a serviceman who dies while serving in a combat zone." It applied "from the time a serviceman first entered [a] combat zone until his subsequent death...." *Id.* at 1248. It also applied to all earlier years for which taxes remained unpaid at the time of the serviceman's death. *Id.* Although the decedent had died in combat, he did not serve in a combat zone during the years for which his wife sought income tax relief. Because taxes for those years had been paid, and the serviceman's widow sought a refund, the court concluded that the statute did not apply. See *id.* ("To allow plaintiff to recover taxes for years of noncombat service (1963 and 1964), prior to Colonel Hampton's combat zone assignment to Vietnam in 1967, would provide plaintiff with a windfall and would stretch the relief afforded by § 692 beyond its intended bounds").

Although neither *DuPont* nor *Hampton* is directly relevant, as they do not concern the version of the statute at issue here, they reinforce the notion that statutes similar to the current version of § 692 must be read narrowly in favor of the government.

**41.** Pl.'s Mem. at 13.

## 1. The Effect of § 405 of the ATSSSA

Section 692(d)(4) does not address whether an individual must have been in an area physically proximate to the attacks to be denominated a specified terrorist victim. Plaintiff argues that this silence, together with the explicit provision in the ATSSSA requiring that VCF claimants (or their decedents) have been present at a crash site "at the time, or in the immediate aftermath, of the terrorist-related airline crashes," ATSSSA, § 405(c)(2)(A)(i), mandates the conclusion that Congress intentionally broadened the definition of "victim" in § 692(d)(4) to persons who were not present at crash sites.[42]

Plaintiff cites the maxim that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); see *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, — U.S. ——, 128 S.Ct. 2326, 2333, 171 L.Ed.2d 203 (2008) (quoting same). Plaintiff concedes that the ATSSSA and the VTTRA are different statutes enacted at different times. It contends, however, that both concern the terrorist attacks of September 11 and are intended to aid victims of those attacks. Consequently, plaintiff maintains, Congress must have crafted § 692(d)(4) with knowledge of, and in light of, § 405 of the ATSSSA.

The government responds that plaintiff's reliance on the ATSSSA is misplaced, *inter alia*, because the VCF in particular and the ATSSSA in general was not a "tax act and was impelled by entirely different concerns from those of the [VTTRA]."[43] A review of the statutes reveals a significant, non-trivial distinction between them, which undermines plaintiff's argument regarding Congressional intent.

First, as plaintiff concedes, the ATSSSA and the VTTRA are related only insofar as both were passed in response to the September 11, 2001 attacks. The ATSSSA is not a tax act.[44] The VCF was designed to obviate the need for victims or survivors to sue to recover compensation and also to protect potential defendants from crushing liability. It was an administrative method of compensating victims rather than the bestowing of a benefit on them.[45] By contrast, the VTTRA identifies a group of individuals upon whom, by an act of legis-

---

42. Pl.'s Mem. at 14.

43. Def.'s Opp. at 20.

44. The ATSSSA was enacted on September 22, 2001, while the VTTRA was enacted on January 23, 2002.

45. Reinforcing this view of the VCF is the fact that in order to make a claim on the VCF, an eligible individual must "waive[ ] the right to file a civil action (or to be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001." ATSSSA § 405(c)(3)(B)(i). More than one commentator has noted the possibility that the VCF was an administrative remedy rather than a pure gift to victims of the attacks. See Britta Gilmore, For Love, and For Money: Viviana Zelizer's The Purchase of Intimacy, 28 WOMEN'S RTS. L. REP. 181, 208–09 (Spring/Summer 2007) ("Moreover, scholars have raised the possibility that the VCF might not have been truly intended to benefit victims of the 9/11 attacks, but rather to insulate a beleaguered airline industry from accountability and almost certain bankruptcy should individual claims reach the nation's courts"); Richard P. Campbell, The September 11th Attack on America: Ground Zero in Tort and Insurance Law, 9 CONN. INS. L.J. 51, 56 (2002) ("[T]he ATSSSA may be fairly characterized as a bargain between business interests intending to bailout the large domestic commercial airlines and consumer interests looking to provide a ready source of funds to compensate injured individuals and families who lost loved ones").

lative grace, the government has conferred a benefit.

The fact that the two acts were enacted in different contexts and for different purposes militates against plaintiff's argument that the ATSSSA and the VTTRA should be construed in tandem, and that the court should draw interpretative significance from differences in their definitions of "eligible individuals" or "victims." As the Supreme Court has noted, the principle "that the presence of a phrase in one provision and its absence in another reveals Congress' design ... grows weaker with each difference in the formulation of the provisions under inspection." *City of Columbus v. Ours Garage and Wrecker Service, Inc.,* 536 U.S. 424, 436, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002). Not only do § 405 of the ATSSSA and § 692(d)(4) of the VTTRA use different formulations—e.g., "eligible individuals" versus "victims" [46]— but they are found in different statutes that have different purposes. By its terms, the *Russello* presumption applies only to different sections of a single act, not to separate sections of separate acts. See *GTE South Inc. v. Morrison,* 6 F.Supp.2d 517, 530 (E.D.Va.1998) ("[I]nterpretive inferences should be drawn from different sections in the same Act as opposed to different Acts").[47] For this reason, and because the two statutes were passed for different reasons and under

different circumstances, the court concludes that the *Russello* rule is not applicable in this case. As a consequence, it must look to the language of § 692(d)(4) to determine whether Kalahasthi died "as a result of wounds or injury incurred as a result of the terrorist attacks against the United States ... September 11, 2001." The ATSSSA is relevant only to the extent that it informs this analysis.

### 2. The Language of § 692(d)(4)

The VTTRA does not address whether an individual must have been present at the scene of the attacks to be considered a "specified terrorist victim." As a result (and in contrast to § 405 of the ATSSSA), it is clear that the fact that an individual was *not* present does not automatically preclude a finding that he or she was a "specified terrorist victim." This raises a question as to how attenuated a causal chain is contemplated by the statutory language "as a result of wounds or injury incurred as a result of the terrorist attacks." 26 U.S.C. § 692(d)(4).

Section 692(d)(4) uses the phrase "as a result of" twice. First, a victim's death must be "as a result of" wounds or injury. Second, the wounds or injury must be "incurred as a result of" the terrorist attacks. The court must thus inquire whether (1) Kalahasthi died "as a result of wounds or injury," and (2) if she did, whether "wounds or injury" were the result of the terrorist attacks.[48] The court

---

**46.** The ATSSSA denominates individuals who were hurt or killed in the attacks "eligible individuals" because the focus is on recovery from the VCF. By contrast, the VTTRA refers to individuals entitled to tax relief as "victims."

**47.** A principal rationale for the *Russello* rule is that statutes are presumed to be internally consistent and carefully drafted. See *Russello,* 464 U.S. at 23, 104 S.Ct. 296 ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship"); *Kapral v. United States,* 166

F.3d 565, 579 (3d Cir.1999) (Alito, J., concurring) ("The *Russello* canon is based upon a hypothesis of careful draftsmanship"). This presumption carries significantly less force, if any at all, where the terms being compared are found in separately drafted statutes—i.e., statutes drafted by separate committees at separate times. While a general presumption in favor of congressional consistency exists, the force of the *Russello* rule is greatly weakened where a court cannot presume a single act of consistent drafting.

**48.** Plaintiff suggests in passing that even if the court finds that the statute does not contemplate death as a result of emotional injuries,

addresses these questions in turn.

### a. "As a Result of Wounds or Injury"

The first question is whether Kalahasthi's death was caused by "wounds or injury." As a preliminary matter, the parties appear to agree that Kalahasthi's death was caused either directly or indirectly by emotional suffering arising out of the terrorist attacks of September 11. The question is whether her emotional suffering constitutes a "wound or injury." Plaintiff argues that "the generic term 'injury' includes emotional distress and other types of non-physical injuries."[49] Where the word "injury" is used alone, and not as part of the phrase "physical injury," courts have held that it encompasses emotional injury. See *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 556, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994) ("But while the statute may have been primarily focused on physical injury, it refers simply to "injury," which may encompass both physical and emotional injury").

There no doubt, however, that when it chooses to do so, Congress is capable of specifying whether the injury contemplated by a statute is physical or emotional. See *Oliver v. Keller*, 289 F.3d 623, 627 (9th Cir.2002) (discussing the requirement in the PLRA that plaintiff suffer a physical injury before he can recover for emotional injury, and stating that "if Congress had meant that 'any' physical injury was sufficient to permit a prisoner's mental and emotional injury claim, it could have said as much"). Just as some statutes expressly demand that injury be physical, other statutes explicitly differentiate between injury *and* mental disability. See Hostage

Relief Act of 1980, Pub.L. No. 96–449, 94 Stat. 1972, § 202(a) (granting tax relief to "an individual who was at any time an American hostage and who dies as a result of injury or disease or physical or mental disability incurred or aggravated while such individual was in captive status"). Indeed, despite the Court's statement in *Consolidated Rail*, other statutes explicitly define injury, even when not modified by "physical," as including only physical harm. See *Guidry v. Durkin*, 834 F.2d 1465, 1471–72 (9th Cir.1987) ("[T]he very nature of the FECA as a workers' compensation statute bars recovery for anything other than injuries (resulting in some form of physical disability) or death"); 5 U.S.C. § 8101(5) (defining "injury" as various types of physical harm and implicitly, although not explicitly, excluding emotional injuries). In addition, close examination of *Consolidated Rail* reveals that even though the Court there stated that "injury" included emotional injury, it restricted those who could claim such injury to workers "within the zone of danger of physical impact." See *Consolidated Rail*, 512 U.S. at 556, 114 S.Ct. 2396 ("We believe that allowing recovery for negligently inflicted emotional injury as provided for under the zone of danger test best harmonizes these considerations. Under this test, a worker within the zone of danger of physical impact will be able to recover for emotional injury caused by fear of physical injury to himself, whereas a worker outside the zone will not").

As these authorities suggest, while a statutory reference to "injury" may signify

---

"there is no question that [Kalahasthi's] extreme emotional distress resulted in a physical manifestation; her suicide." (Pl.'s Mem. at 19.) This attempt to recast the physical harm Kalahasthi inflicted on herself as directly caused by the terrorist attacks fails. If Kalahasthi's emotional distress does not qualify as an injury under the statute, logically the

physical manifestation of that distress also does not qualify. Stated differently, a physical injury suffered because of emotional distress is not an injury that was independently caused by the terrorist attacks.

**49.** Pl.'s Mem. at 17.

that Congress intended to include both physical and emotional injury, omission of the modifier "physical" does not conclusively demonstrate an intent to include emotional injuries. This is especially true where, as here, the court is interpreting a tax statute and must resolve ambiguities in favor of the government. Plaintiff has failed to show that the statute's reference to injury and its lack of modifiers unambiguously signals that emotional as well as physical injuries fall within its ambit. Instead, the meaning of the term must be determined by looking to the general purpose of the statute and the specific context in which the word is used.

As noted, there is little legislative history discussing the meaning of "specified terrorist victim." The only direct statement defining the phrase is found in the Joint Committee Technical Explanation. That report states that "[t]he exemption applies to ... individuals whether killed in an attack (e.g., in the case of the September 11, 2001, attack in one of the four airplanes or on the ground) or in rescue or recovery operations." [50] Although the report does not constitute legislative history, it strongly suggests that the individuals Congress intended to benefit by passing the statute were persons who died in the September 11 airplane crashes (either because they were in the planes or in the buildings hit by the planes) and those who died while participating in rescue operations. Neither category of victim identified by the Joint Committee supports the notion that Congress contemplated the provision of tax benefits to those who suffered non-physical injuries as a result of the attacks resulting in death. Apart from direct victims of the crashes, the individuals who fit the definition in the Joint Committee report are the firefighters, police, and emergency workers who assisted in rescue and recovery—many of whom died in the effort.[51] All of these individuals suffered physical injuries that led to their deaths. Moreover, all of these individuals were, in some way or another, physically present at the site of one of the crashes. Clearly the passengers and crew on the airplanes as well as individuals "on the ground" were present when the attacks occurred. Additionally, rescue and recovery workers were necessarily working and injured at the crash site, even if they were not present at the moment of the crash itself.

Thus, the Joint Committee report indicates that "specified terrorist victims" must have been present at the site of the crash and have suffered physical "wounds or injuries." Both those on the planes and in the buildings hit by the planes, as well as rescue and recovery workers, suffered physical injury because they were present at the scene. Plaintiff does not dispute this interpretation of the Joint Committee report, nor does it offer any competing legislative history or staff commentary. Rather, plaintiff relies on the presumption that *if* Congress had intended to require that the injuries be physical only, it could and would have said so. This inferential argument, which is inherently weak be-

---

**50.** Staff Report at 6.

**51.** Others who might be included in the definition provided by the Joint Committee are recovery workers at the crash sites, particularly the World Trade Center site, many of whom have been diagnosed with respiratory illnesses or cancer. See Kristen Lombardi, Death By Dust: The Frightening Link Between the 9–11 Toxic Cloud and Cancer, The Village Voice (Nov. 21, 2006) (at http://www.villagevoice.com/news/0648,lombardi,75156,2.html) (last checked June 30, 2008). To the extent that any of these injuries result in death, these workers too might be said to have died as a result of injuries incurred as a result of the terrorist attacks. To date, there has been no litigation of the relevant provisions of the VTTRA regarding these workers.

cause the statute being interpreted is a tax exemption statute, is further weakened by the Joint Committee report.[52]

Although the Joint Committee report is strong and persuasive evidence of the proper interpretation to be given to the statute, the court must ask if it is a "rational interpretation of the statute" to conclude that a victim must have be present at a crash site and suffered physical injury as a result to obtain tax relief under the VTTRA. *Consolidated Chollar*, 133 F.2d at 441. Plaintiff argues that use of the phrase "wound or injury" implies a dichotomy between physical "wounds" and the more expansive term "injury." The government counters that the dichotomy is between "wounds"—physical harm causing a break of the skin—and a broader range of physical harm.[53] As noted earlier, the question is not whether plaintiff's interpretation is rational or even plausible. It is rather whether the government's interpretation is plausible, such that the rule requiring narrow construction of tax deduction statutes against the taxpayer and in favor of the government applies.[54]

Both plaintiff and the government implicitly rely on the interpretive canon *noscitur a sociis*, which stands for the proposition "that a word is known by the company it keeps." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961); see *James v. United States*, 550 U.S. 192, 127 S.Ct. 1586, 1605, 167 L.Ed.2d 532 (2007) ("Of course *noscitur a sociis* is just an erudite (or some would say antiquated) way of saying what common sense tells us to be true: '[A] word is known by the company it keeps,'" quoting *Jarecki* ); *id.* ("[A]nother canon of statutory construction, *noscitur a sociis*, ... counsels that 'the meaning of an unclear word or phrase should be determined by the words immediately surrounding it,'" quoting BLACKS'S LAW DICTIONARY 1084 (7th Ed. 1999)). The Supreme Court has stated that the maxim "is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki*, 367 U.S. at 307, 81 S.Ct. 1579 (citing *Neal v. Clark*, 95 U.S. 704, 708–09, 24 L.Ed. 586 (1877)). Although the parties agree on the appropriate doctrine to apply, they dispute the import of the coupling of "wound" with "injury." The dictionary definition of "wound" tends to

---

52. The only other publication the parties cite that interprets "specified terrorist victim" is an internal IRS "Non Docketed Service Advice Review" ("NSAR"). As the government concedes, NSARs are merely in-house legal advice provided by IRS counsel to a field agent. (Govt.'s Opp. at 18 n. 9.) They thus have no precedential effect. They do, however, represent agency counsel's interpretation of a given statute and may be accorded some persuasive weight. NSAR 20288 dealt with a claimant who contended that a decedent had died after suffering a stroke "as a result of" the bombing attack on the Alfred P. Murrah Federal Building in Oklahoma City in 1995. IRS counsel advised, *inter alia:* (1) that the term "injury" meant physical injuries and (2) that § 692(d)(4) "requires that the victim be within the zone of destruction or an area directly impacted by the terrorist attack." See 2002 IRS NSAR 20288, 2002 WL 32167979. Although the court does not rely on the NASR in deciding the issue, it notes that counsel's interpretation of the VTTRA is consistent with the court's.

53. The government appears to draw support from NSAR 20288 without explicitly relying on it. There, the IRS applied the maxim of *noscitur a sociis*, and determined that "the term 'injury' in the phrase 'wound or injury,' suggests a bodily injury where the skin is not broken, but does not suggest that mental injuries are included, such as a heart attack or stroke brought on by emotional shock." NSAR 20288.

54. It is particularly appropriate to apply such a result in the case of the VTTRA, given that the Joint Committee report strongly suggested that "injury" was limited to physical harm.

.

support the government's argument. The Oxford English Dictionary defines wound as "[a] hurt caused by the laceration or separation of the tissues of the body by a hard or sharp instrument, a bullet, etc.; an external injury."[55] Other dictionaries also define the term in a way that contemplates a laceration or breaking of the skin.[56]

These definitions of "wound" differ from the more general definition of "injury." The Oxford English Dictionary defines "injury" when used in the sense contemplated in the statute as "[h]urt or loss caused to or sustained by a person or thing; harm, detriment, damage."[57] While this definition does not require that injury be physical, the fact that "injury" is coupled with "wound" suggests that it refers to forms of physical injury that do not involve lacerations or breaking of the skin.[58] Stated differently, inclusion of the word "wound" signifies that the statute contemplates physical harm, while inclusion of the word "injury" indicates that a variety of types of physical harm are contemplated. Given the limited meaning of "wound," the fact that it appears with "injury" makes it less plausible that "injury" should be interpreted broadly to encompass non-physical injuries.

Consequently, the court concludes that close examination of the use, in context, of "wounds or injury" in § 692(d)(4) supports the conclusion that the injuries contemplated in the statute must be physical. While this aspect of the statute is not unambiguous, it is clearly a rational interpretation of the statutory language, and one that is supported by the Joint Committee report. In fact, the court believes it is *more* plausible than plaintiff's interpretation, which relies wholly on negative inference. When interpreting a tax exemption statute that is susceptible of two rational interpretations, the court must adopt the narrower construction. Here, that construction is that "injury" as used in § 692(d)(4) is physical injury, and that Kalahasthi's emotional distress and ensuing suicide are not covered by the statute.

### b. "As a Result of the Terrorist Attacks"

The conclusion that plaintiff is not eligible for estate tax relief under § 2201 is reinforced by proper construction of "as a result of the terrorist attacks." Under a plausible interpretation of this phrase, Kalahasthi did not die as a "result" of the terrorist attacks.

"As a result of" is an inherently ambiguous phrase. On the one hand, it is clear that Kalahasthi's suicide was, to some extent, "a result of" the terrorist attacks. This raises the secondary question, however, as to how long a chain of causation the phrase contemplates. A hypothetical serves to illustrate the point: Suppose that

---

**55.** OXFORD ENGLISH DICTIONARY, ONLINE EDITION (2d Ed. 1989), definition 1.a.

**56.** See Dictionary.com (http://dictionary.reference.com/browse/wound) (last checked June 30, 2008), definition 1 ("an injury, usually involving division of tissue or rupture of the integument or mucous membrane, due to external violence or some mechanical agency rather than disease"); WEBSTER'S THIRD INTERNATIONAL DICTIONARY 2638 (1976), definition 1.a. ("an injury to the body consisting of a laceration or breaking of the skin or mucous membrane usu[ally] by a hard or sharp instrument forcefully driven or applied").

**57.** OXFORD ENGLISH DICTIONARY, ONLINE EDITION (2d Ed. 1989), definition 3.a.; see also Dictionary.com (http://dictionary.reference.com/browse/injury) (last checked June 30, 2008) ("harm or damage that is done or sustained"); WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1164 (1976) ("hurt damage or loss sustained").

**58.** It is clear that much of the physical harm suffered by crash victims was not "wounds." Victims suffered broken bones, collapsed lungs, and other internal injuries that do not constitute "wounds" because they do not involve broken skin or mucous membrane.

Kalahasthi's brother, grief-stricken because of his sister's death, also committed suicide. While the terrorist attacks might remain a "but for" cause of the brother's suicide, such that one could say he died "as a result of" the attacks, it is highly unlikely that Congress intended in § 692(d)(4) to extend tax relief to his estate. This demonstrates that there is an implicit limit on the chain of causation suggested by "as a result of." Cf. *WTC Disaster Site*, 414 F.3d at 376 ("[I]n the cosmological sense, '[i]f relate to were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for [r]eally, universally, relations stop nowhere,'" quoting *Travelers*, 514 U.S. at 655, 115 S.Ct. 1671); *id.* ("Thus, a phrase such as 'relat[ing] to,' though 'clearly expansive' ... is not a self-evident guide to the precise extent of Congress's preemptive intent," quoting *Travelers*, 514 U.S. at 655, 115 S.Ct. 1671). Given the fact that the term is necessarily limited, the court must examine the statute to determine how far from the attacks the chain of causation extends.

This analysis begins with the language of the Joint Committee report. It is apparent that members of the committee did not believe that individuals as far removed from the attacks as Kalahasthi were included within "specified terrorist victims." Kalahasthi was neither "killed in an attack" nor was she involved in rescue and recovery operations. Nothing in the report, moreover, suggests that individuals who took their life because of an emotional injury caused by the terrorist attacks were meant to be covered by the statute.[59]

The Joint Committee's interpretation is supported by such analogous law as there is. As noted, the Second Circuit analyzed "as a result of" as used in the ATSSSA, and compared it with another statutory term, "related to." The court held that "whereas § 405 relief is limited to injuries suffered 'as a result of' the air crashes, the scope of § 408, dealing with '*all* actions brought for *any* claim ... resulting from *or relating to*' the crashes ..., is clearly broader." *WTC Disaster Site*, 414 F.3d at 376 (emphasis original) (quoting ATSSSA, § 408).[60] Although the court's opinion fo-

**59.** It is frequently more difficult to identify a clear causal link between an event and emotional harm than between an event and physical harm. See *Consolidated Rail*, 512 U.S. at 545, 114 S.Ct. 2396 ("'Because the etiology of emotional disturbance is usually not as readily apparent as that of a broken bone following an automobile accident, courts have been concerned ... that recognition of a cause of action for [emotional] injury when not related to any physical trauma may inundate judicial resources with a flood of relatively trivial claims, many of which may be imagined or falsified, and that liability may be imposed for highly remote consequences of a negligent act,'" quoting *Maloney v. Conroy*, 208 Conn. 392, 397–98, 545 A.2d 1059 (1988)).

Courts have thus set limits on emotional distress recoveries in tort actions by requiring physical proximity to some risk of physical harm. See *id.* at 546, 114 S.Ct. 2396

("[C]ourts have realized that recognition of a cause of action for negligent infliction of emotional distress holds out the very real possibility of nearly infinite and unpredictable liability for defendants. Courts therefore have placed substantial limitations on the class of plaintiffs that may recover for emotional injuries and on the injuries that may be compensable," citing *Thing v. La Chusa*, 48 Cal.3d 644, 654, 257 Cal.Rptr. 865, 771 P.2d 814 (1989)); *id.* at 546–47, 114 S.Ct. 2396 (recognizing three major "limiting tests": (1) the physical impact test; (2) the "zone of danger" test; and (3) the "relative bystander" test, and adopting the "zone of danger" test).

**60.** As noted, "eligible individuals" under the ATSSSA must have been present at both the time and place of the crash. The Second Circuit's opinion implied that "as a result of" is harmonious with these constraints on causation.

cused on "relating to" rather than "as a result of," its construction of the broader term is instructive in examining the scope of causation under the VTTRA.[61] Specifically, the court recognized that even broad "relating to" causation must have some limit. Analyzing where that limit lay, it held that "claims of injuries from inhalation of air rendered toxic by the fires, smoke, and pulverized debris caused by the terrorist-related aircraft crashes of September 11" were "related to" and "[arose] out of" the crashes. *Id.* at 377; see *id.* ("Congress intended ATSSSA's cause of action to be sufficiently expansive to cover claims of respiratory injuries by workers in sifting, removing, transporting, or disposing of that debris").

The fact that the *WTC Disaster Site* court found it necessary to rely on the broader scope of "relating to" causation to find coverage for respiratory injuries indicates that it believed "as a result of" causation did not extend to such injuries. While *WTC Disaster Site* interpreted the ATSSSA rather than the VTTRA, and while the court does not assume that terms used in the two statutes have equivalent meanings, it nonetheless find the analysis of the *WTC Disaster Site* court persuasive, as it considers the meaning of "as a result of" in the context of the September 11 terrorist attacks, and provides support for the Joint Committee's suggestion that victims such as Kalahasthi fall outside the statute's intended scope of causation.

Additional support is found in the law addressing causation where a victim has committed suicide. Courts in different ju-risdictions have developed a nuanced view as to whether suicide constitutes an intervening cause that breaks the chain of causation for purposes of a tort action.[62] The seminal Supreme Court case on the subject states the rule in absolute terms. In *Scheffer v. Washington City, V.M. & G.S.R. Co.*, 105 U.S. 249, 26 L.Ed. 1070 (1881), plaintiff argued that defendant had proximately caused the decedent's suicide through negligent actions. The Court held that the decedent's suicide was an intervening cause and that "[t]he proximate cause of the death of Scheffer was his own act of self-destruction." *Id.* at 252. In doing so, it rejected the argument that his death was attributable to the negligence of the defendant. See *id.* ("The argument is not sound which seeks to trace this immediate cause of the death through the previous stages of mental aberration, physical suffering, and eight months' disease and medical treatment to the original accident on the railroad. Such a course of possible or even logical argument would lead back to that 'great first cause least understood,' in which the train of all causation ends").

Although some exceptions have developed, the *Scheffer* rule has survived over time. See *Taylor v. Wausau Underwriters Ins. Co.*, 423 F.Supp.2d 882, 898 (E.D.Wis.2006) ("In the context of a wrongful death action where the death resulted from suicide, 'the practically unanimous rule is that such act is a new and independent agency which does not come within and complete a line of causation from the wrongful act to the death and therefore does not render defendant liable

---

**61.** Under the Second Circuit's logic, if a harm does not "relate to" the terrorist attacks, it certainly cannot have occurred "as a result of" the attacks.

**62.** The court offers this discussion by way of analogy only. Plaintiff argues that this authority is irrelevant to interpretation of the statute in question. The court disagrees. It is unlikely that Congress would have afforded tax relief to individuals who could not prove causation in tort. Because it must interpret tax exemption statutes narrowly, the court concludes that it should not adopt a *more* liberal causation standard than that usually employed in tort actions unless specifically directed by Congress to do so.

for the suicide,'" quoting C.T. Drechsler, Annotation, Civil Liability for Death by Suicide, 11 A.L.R.2d 751 § 4[a] ); *Estate of Ko by Hill v. Sears Roebuck and Co.*, 982 F.Supp. 471, 475 (E.D.Mich.1997) ("Generally, a decedent's suicide is considered an unforeseeable intervening act between the defendant's negligent conduct and the decedent's death"). The generally recognized exception to this rule is where an "actor's negligent conduct so brings about the delirium or insanity of an other as to make the actor liable for it." RESTATEMENT (SECOND) TORTS § 455. In such a situation, an actor

> "is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity (a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or (b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason." *Id.*

Thus, the defendant in a tort action may be responsible for another's suicide if he is responsible for driving the decedent delirious or insane and that state either prevents the decedent from understanding the nature of the act of committing suicide or makes it impossible for him to resist committing the act. Were Kalahasthi suing in tort, she would have to satisfy either prong (a) or prong (b) of § 455. On the record presently before the court, plaintiff has made neither showing. Although she was clearly distressed, Kalahasthi's suicide notes indicate that she decided to take her life realizing fully the effect of her actions and after a period of consideration. Indeed, Kalahasthi explained that she chose not to live without her husband because the pain was too great. She waited more than five weeks after his death before taking her own life and reached out to many people during that time. Given the interval between the attacks and her death, and her apparent understanding of the nature of her actions, it appears unlikely that plaintiff would be able to prevail on a wrongful death claim.

This body of case law reinforces the court's conclusion that, as a matter of statutory interpretation, Kalahasthi's suicide must be viewed as an intervening cause that precludes a finding she died "as a result of" the terrorist attacks. Any other conclusion would overlook the clear import of the Joint Committee report, and require a finding that Congress intended to extend causation beyond the traditional limits set by tort law. It would also run counter to the proposition that tax exemption statutes must be construed narrowly.

Sound policy supports this interpretation. As the government notes, plaintiff's proposed construction of the statute does not clearly demarcate injuries caused by the terrorist attacks from those that are not. The hypothetical "hard cases" are many. A mother might have died of a heart attack after learning that her son had been killed in one of the crashes. Her death might well have been caused by a preexisting coronary condition but precipitated by news of the attacks. A son might have refused to continue chemotherapy treatments after learning that his father died in one of the crashes, and succumbed to cancer three months later. Although the crashes "caused" him to refuse treatment, he died as a result of a disease he had contracted earlier. Finally, there is the hypothetical discussed earlier, that of Kalahasthi's brother who committed suicide upon learning of his sister's death. Surely, if Kalahasthi's death was "a result of" the crashes, her brother's death was too. These examples merely illustrate that it would be difficult, if not impossible, to draw a line where the chain of causation stops if plaintiff's interpretation were adopted.

Plaintiff has offered no persuasive authority that Congress intended to adopt this broad view, and the duty to read tax exemption statutes narrowly weighs against it. For all these reasons, the court finds that Kalahasthi was not a "specified terrorist victim" for purposes of § 692(d)(4), and thus that plaintiff's motion for summary judgment must be denied.

### E. Conclusion

Interpreted narrowly, § 692(d)(4) requires that a "specified terrorist victim" suffer physical injury as a direct result of the terrorist attacks of September 11, 2001 (or the attack on the Alfred P. Murrah Building in 1995). Applying this definition to the uncontroverted facts of this case, Kalahasthi's death neither resulted from a physical injury, nor was it a sufficiently direct result of the attacks to render her a "specified terrorist victim" for the purposes of the VTTRA. Plaintiff's argument that the reduced estate tax rates in § 2201(c) apply to Kalahasthi's estate therefore fails as a matter of law.[63]

### III. CONCLUSION

For the foregoing reasons, the court denies plaintiff's motion for summary judgment and enters summary judgment in favor of the government.

---

[63]. The court appreciates the tragedy this case entails. Kalahasthi was one of innumerable individuals whose lives were changed forever by the events of September 11, 2001. In her case, the anguish was too great to bear and she took her own life. The fact that the court is sympathetic to her circumstances does not, unfortunately, translate into a favorable reading of the statutory language.